THE STATE v. CHARLES FRANKLIN ALLEN, Appellant.

Division Two, November 19, 1921.

1. MANSLAUGHTER: Malice: Sudden Passion: Instruction. Where defendant wrote deceased (his wife's foster mother) that if she ever placed her foot in his yard he would blow her brains out, which of itself clearly indicated malice aforethought, and the next day, as he came around the house, he discovered her standing in the highway, near his gate, where for fifteen or twenty minutes she had been talking with his wife, and when she began to curse

him he laid down a hammer and went to his wife and asked her to go to the house, and deceased struck at him with a cane, and after he and his wife entered the house he secured his shotgun and shot deceased while she was still in the highway, twenty-five feet or more distant from him, no instruction for manslaughter in any degree should have been given, and one telling the jury that if defendant intentionally shot deceased whilst in a violent passion suddenly aroused by reason of her having assaulted him with a cane, and if said shooting was not done in self-defense and was not done with malice but was the result of such passion, defendant should be found guilty of manslaughter in the fourth degree, was properly refused.

2. MURDER: Malice: Use of Deadly Weapon: Presumption of Malice. Where defendant admitted the shooting of deceased with a shotgun, but claimed justification and there were no eye witnesses except defendant and his wife, an instruction on the presumption of malice arising from the use of a deadly weapon upon another at some vital point is proper. In such case it was proper to instruct the jury that he who wilfully uses upon another at some vital part a deadly weapon, such as a shotgun, loaded with powder and leaden bullets, must, in the absence of qualifying facts, be presumed to know that the effect is likely to produce death, and knowing this must be presumed to intend death as the probable and ordinary consequence of such act, and if such deadly weapon is used without just cause or provocation he must be presumed to do it wickedly and from a bad heart.

3. EVIDENCE: Exhibition of Bloody Clothes. Where the record recites a statement by the trial judge that the garments of deceased were not exhibited to the jury and that those which were bloodstained were covered with others on which there was no blood, and that he thereupon directed them to be removed from the courtroom, and the undisputed evidence is that defendant wrote a letter threatening to kill deceased if she came upon his premises, and shot her as she stood in the public highway in front of his gate, cursing him, and the jury gave him the lowest punishment possible under the instructions, he has no just ground to complain on appeal that the court permitted the bloody garments of deceased to be exhibited before the jury or to remain in plain view of the jury.

4. ———: Self-Serving Declarations: Res Gestae. Self-serving declarations of defendant, made in the absence of deceased, are not competent evidence. Where both defendant and his wife were permitted to testify fully as to everything that occurred and was said in the presence of deceased, and his wife was permitted to testify what she said to defendant concerning the threats made

by deceased, in his absence, what defendant said to his wife, in the absence of deceased, at the time his wife repeated deceased's threats, is no part of the *res gestae*, and is not competent.

5. ──────: **Uncommunicated Threats.** It is not error to refuse to permit a witness to testify that she had a conversation with deceased at the time defendant's child was born, in which deceased said she had often tried to get defendant's wife to produce an abortion and destroy the child and that she did not propose that such child should live, where the subject-matter of said conversation was not communicated to defendant.

6. **REMARKS OF COURT: Protection of Wife and Child.** Where the statements of deceased concerning defendant's child were incompetent, because not communicated to defendant, and defendant's counsel urged their competency "on the theory that a man has the same right to protect his wife and child that he has himself," a remark by the court that "such may be true, but the defendant has been on the stand and dosen't show in his testimony that it was in the protection of his wife and child that the shot was fired," was not prejudicial, the defendant having testified that as deceased approached him he thought she had a gun or something in her hand and he thereupon shot her, his wife and child not being present.

7. **INSTRUCTIONS: Refusing Defendant's.** Where the instructions given for the State clearly and correctly state all the law necessary for the jury to consider, it is not error to refuse others asked by defendant.

8. **EVIDENCE: Wife as Witness: Testimony Before Coroner: Impeachment.** The testimony of defendant's wife voluntarily given before the coroner may be used at the trial, on cross-examination, for the purposes of contradiction and impeachment, as to any matter referred to at the trial; and it is not incumbent upon the State, in offering her said testimony for such purpose, to show that she had been advised she could decline to testify, but a showing that she testified of her own volition is made by a recital, in the transcribed and signed testimony of the witnesses at the inquest, that she "voluntarily testified as a witness without objection, and at her own instance was recalled to enable her to give additional testimony," and such recital, it uncontradicted, must be taken as true.

9. ──────: ──────: ──────: ──────: **As Other Witnesses.** The wife of defendant, who is his principal witness and testifies to every phase of the case, stands upon the same plane as any other witness and is liable to impeachment in the same way; and if she made material statements out of court which were in conflict with her testimony at the trial, whether made at the coroner's inquest or elsewhere, the State is entitled to use them.

Appeal from Grundy Circuit Court.—*Hon. L. B. Woods,* Judge.

AFFIRMED.

*Lesley P. Robinson, J. D. Allen* and *H. E. Thompson* for appellant.

(1)  The trial court erred in refusing defendant's offered instruction numbered eleven on manslaughter and erred in failing and refusing to instruct properly on manslaughter. State v. Turner, 246 Mo. 598; State v. Conley, 255 Mo. 185; State v. Wilson, 242 Mo. 481; State v. Sebastian, 215 Mo. 59; State v. Hanson, 231 Mo. 14; State v. Heath, 221 Mo. 565; State v. Gordon, 191 Mo. 114; State v. Vest, 254 Mo. 466; State v. Grugin, 147 Mo. 39, 50; State v. Brown, 188 Mo. 451; State v. Mermann, 117 Mo. 629; State v. Winsell, 98 Mo. 137; State v. Wilson, 250 Mo. 329; State v. Whitsett, 232 Mo. 529; State v. Good, 271 Mo. 49; State v. Beckner, 194 Mo. 299; State v. Nelson, 166 Mo. 191; State v. Spencer, 160 Mo. 123; State v. Dorn, 202 Mo. 12; 21 Cyc. 972; Kelly's Criminal Law, sec. 250.  (2)  The trial court erred in giving the State's instruction numbered nine on the presumption of guilt. State v. Swearingen, 269 Mo. 177; State v. Cole, 213 S. W. 110; State v. Stubblefield, 239 Mo. 530; State v. Garret, 207 S. W. 784; State v. Burns, 213 S. W. 114; State v. Wansong, 217 Mo. 50, 58; State v. Frame, 204 S. W. 8; State v. Sloan, 207 S. W. 782; State v. Little, 228 S. W. 797.  (3)  The trial court erred in permitting the bloody garments of the deceased to be exhibited before the jury, and erred in leaving them before the jury during the afternoon session, and during the night session, and also during a portion of the morning session of the court in plain view of a number of the jurors all the time, and all of them while passing in and out of the jury box. State v. Porter, 276 Mo. 388; State v. Edelen, 231 S. W. 588.  (4)  The trial

court erred in refusing to allow the wife of defendant to testify as to what she told defendant in the house as to the threats and conduct of deceased immediately prior to their entering the house, and what defendant said when starting out with the gun, as evidence of his intentions, and his state of mind, all of which was a part of the *res gestae.* State v. Reaves, 195 S. W. 1030; State v. Vest, 254 Mo. 1. c. 466; State v. Cruts, 231 S. W. 606; State v. Anderson, 252 Mo. 98. (5) The trial court erred in refusing defendant's offer of evidence to the effect that on the day the baby was born as well as before, that she (deceased) did not propose that the baby should live. State v. Burns, 213 S. W. 117. (6) (a) The court erred in stating within the hearing of the jury that "defendant has been on the stand and don't show in his testimony that it was in the protection of his wife and child the shot was fired." (b) And also erred in making these remarks to counsel for defendant for objecting to the presence of bloody clothes: "and the court sees no reason at this time in order to gratify the wish of the attorney," as being prejudicial to defendant and counsel. Rose v. Kansas City, 125 Mo. App. 236; Wright v. Richmond, 21 Mo. App. 81; State v. Hyde, 234 Mo. 200, 255; Padgett v. Ry., 159 Mo. 155; Schmidt v. Railroad, 149 Mo. 283; State v. Davis, 217 S. W. 91; Landers v. Railroad, 134 Mo. App. 80; 38 Cyc. 1316; R. S. 1919, sec. 4037. (7) The court erred in not giving defendant instructions 1, 2, 3, 4, and 5, and instruction 11, being approved instructions, on defendant's theory of his case, and erred in its attempt to cover defendant's facts in instructions asked by the State. (8) The trial court erred in admitting in evidence the testimony of Lea Allen, wife of defendant, taken at the inquest, and erred in permitting the State to cross-examine her at the trial on her testimony obtained at the inquest; for the reason she was not advised that she may not testify, having then no counsel, but was placed on the stand by the coroner (or State) and compelled to testify. R. S. 1919, sec. 4036.

*Jesse W. Barrett,* Attorney-General, and *Albert Miller,* Assistant Attorney-General, for respondent.

(1)   The court did not commit error in permitting the bloody garments, worn by deceased at the time of the killing, to be brought into the courtroom and in permitting same to remain therein exposed (if exposed) to the jury's view. At the trial of a case, such as the one at bar, it is proper to admit in evidence and permit the jury to inspect clothing worn by deceased at the time of the killing. State v. Stair, 87 Mo: 268. Evidence of this character is, in the discretion of the court, admissible, although the *corpus delicti* is admitted, to show the nature of the wound or to throw any relevant light upon a material matter at issue. State v. Porter, 276 Mo. 387, 396; State v. Long, 209, Mo. 366, 382; State v. Miles, 199 Mo. 530, 546; State v. Thornhill, 177 Mo. 691.   (2) The court did not commit error in admitting in evidence the testimony taken at the coroner's inquest.   (a) Statements made by a witness when testifying at the coroner's inquest may be admitted in evidence to impeach him. People v. Bushton, 80 Cal. 160; State v. Dixon, 131 N. C. 808; People v. Hawley, 111 Cal. 78, 88; State v. Eddings, 71 .Mo. 545; State v. Jefferson, 77 Mo. 136. (b)   Defendant's wife was not improperly cross-examined at the trial on her testimony given at the inquest. (3)   The trial court did not commit error in refusing to admit testimony as to what defendant said in the house immediately prior to the fatal shooting. Such declaration was self-serving and no part of the *res gestac.* State v. Long, 201 Mo. 664, 674; State v. Atchley, 186 Mo. 174, 194; State v. Holcomb, 86 Mo. 371, 378; State v. Van Zant, 71 Mo. 541; State v. Shermer, 55 Mo. 83; Angus v. State, 29 Tex. App. 52, 61.   (4)   The court did not commit error in refusing defendant's offer of evidence to the effect that on the day the baby was born as well as before, deceased said that she did not propose that this child should be raised by Lea Allen. Such testimony

was clearly hearsay. State v. Wilson, 250 Mo. 323, 329; State v. McNanara, 212 Mo. 150, 163; State v. Punshon, 124 Mo. 448, 455. (5) Instruction 11, offered by the defendant and involving the subject-matter of manslaughter, was properly refused by the court. The existence of malice was not negatived by any of the testimony in the case. (a) "Manslaughter" is distinguished from murder solely by the absence of malice as a constituent element of the crime. State v. Hartley, 185 Mo. 669. (b) The mere fact of passion upon the part of a slayer will not reduce the homicide from murder to manslaughter where there was a previous purpose to kill. State v. Nelson, 101 Mo. 464; Collins v. United States, 150 U. S. 62, State v. Pankey, 104 N. C. 840. (c) Where the existence of deliberate malice in a person who killed another is once ascertained, its continuance down to the perpetration of the meditated act must be presumed, unless there is evidence to repel it; there must be some evidence to show that the wicked purpose had been abandoned. State v. Johnson, 23 N. C. 354; State v. Tilly, 25 N. C. 424; Riggs v. State, 30 Miss. 635. (d) Where malice is shown to have been harbored, and a fresh provocation arises to the party cherishing the malice the provocation is to be disregarded unless the murderous purpose can be shown to have been abandoned before the act was done; because where provocation intervenes between expression of malice and the killing, the presumption is that the killing was upon the malice and not upon the passion produced by the provocation. State v. Dettmer, 124 Mo. 426, 435; State v. Wilson, 242 Mo. 481, 502. (6) The court did not commit error in giving instruction 9, on the presumption of guilt. Instructions in said form have been repeatedly approved by this court. State v. Schmulbach, 243 Mo. 533; State v. Hudspeth, 159 Mo. 178, 195; State v. Grant, 152 Mo. 57, 64. (7) The mere statement by the court as to what it understood a witness to testify to is not prejudicial when the witness had, in fact, testified as the court stated. State v. Ethridge, 188 Mo. 352; State v. May, 172 Mo. 630, 652; State v. Sanders,

76 Mo. 35; Traction Co. v. O'Neil, 109 Va. 670; The Oriental v. Barclay, 16 Tex. Civ. App. 193; Olson v. Solverson, 71 Wis. 663.   (a)  Statement by the court of the grounds of its ruling as to the competency of evidence is not objectionable as a comment on the evidence.  State v. Ruck, 196 Mo. 416, 434; State v. Thomson, 155 Mo. 300. (8)   The remarks of the court addressed to defendant's counsel in replying to objection made to the presence of bloody clothes: ''The court sees no reason at this time in order to gratify the wish of the attorney while the court thinks no harm done by them, to direct the sheriff to remove them,'' is not reversible error.  State v. Teeter, 239 Mo. 485; State v. Duestrow, 137 Mo. 44, 88; State v. Musick, 101 Mo. 260, 273.

RAILEY, C.—On November 6, 1919, the prosecuting attorney of Grundy County, Missouri, filed, in the circuit court of said county, his verified information, charging defendant with murder in the first degree.  It is alleged therein that defendant feloniously, etc., shot and killed Leota Mahrs, in said county, on October 13, 1919.   On February 5, 1920, defendant waived a formal arraignment and entered a plea of not guilty.  On February 7th, 1920, after a trial before a jury, the latter returned into court the following verdict:

''We, the jury, find the defendant guilty of murder in the second degree, and assess his punishment at imprisonment in the State Penitentiary for a term of ten years.''

Defendant, in due time, filed motions for a new trial and in arrest of judgment.  Both motions were overruled, he was duly sentenced, and an appeal was granted him to this court.

As a matter of convenience, the defendant's *wife*, will be designated in this statement as ''Lea.''

The testimony on behalf of respondent tends to show substantially the following facts: That defendant, with the consent of deceased, married the latter's minor foster

daughter, called Lea Marrs, who was then about fifteen years of age; that after remaining at the home of deceased a day or two subsequently to said marriage, defendant and wife went to live upon a farm in that neighborhood; that they moved several times, and finally located on the Tucker-Waldon form, near the town of Brimson, in said county; that on October 13, 1919, the day of the killing, deceased lived a short distance from the Waldon farm, and within the limits of Brimson; that some animosity existed between defendant and deceased on account of the alleged interference of the latter in defendant's family affairs; that about midnight of October 12, 1919, appellant wrote and addressed a letter to deceased. The envelope on the outside, contained the following: "Mrs. Oddie Myres, Brimson, Missouri." Said envelope contained a letter, which reads as follows:

"Oddie: You have tried to cause trouble and it's going to stop right now. I am warning you if I ever catch you put your foot in my yard I will blow your brains out, and I am going to see that Leah stays away from you. You might get to pay for some of your talk. •

"Frank Allen."

It appears that this letter was received by deceased on October 13, 1919; that about two days before the killing, Lea and her baby were at the home of deceased, where Lea was doing some sewing, on the foster mother's machine, and that afternoon, as Lea went home, the deceased went with her and carried the baby; that Lea also borrowed, on this occasion, a dress from deceased, which is referred to hereafter in the testimony; that on receipt of above letter, the deceased called upon her neighbor, Mrs. James Bennett, and told her about the receipt of the letter; that she was advised by Mrs. Bennett not to go to defendant's house.

The evidence tends to show that about dusk, on the evening of October 13, 1919, the deceased, who had been walking with a cane, on account of a wounded knee, started toward the defendant's house; that she was seen

near the gate opening from defendant's premises on to the public highway; that shortly after she reached this position, two shots were fired, and shortly thereafter the deceased was found killed, about twenty-five or thirty feet from defendant's house, and near the above mentioned gate.

Counsel for defendant, at the commencement of the trial, admitted in open court that defendant had shot and killed deceased.

After the shooting, defendant remained at his home, made no effort to escape, and was taken into custody by the officer.

The foregoing took place in Grundy County, Missouri.

The evidence in behalf of appellant took a wide range at the trial, and it is too voluminous to set out in detail here. It tends to show, in substance, that he was a hard working, industrious man, and had a good reputation for peace and quietude; that he and Lea Marrs, the foster child of deceased and her husband, were married May 26, 1918; that deceased attended the wedding and gave her consent to the marriage; that Lea's mother was dead, and she was not related to deceased; that defendant and his wife moved to the Tucker-Waldon farm in May, 1919; that Melvin Richard Allen, minor child of defendant and Lea, was born March 26, 1919; that Lea became in a family way about one month after her marriage.

The testimony of Lea tends to show, in substance, that deceased, who was shown to be a turbulent and quarrelsome woman, became angry at defendant and his wife when she found the latter was pregnant; that she insisted upon Lea producing an abortion, to get rid of said child; that she offered part of a parasol to Lea, to accomplish this purpose, and told her how to use it; that she furnished Lea some medicine to use for this purpose; that she urged Lea to jump off of a chair, or to accomplish the purpose in some other way, to get rid of the child; that Lea communicated the above facts to her husband; that

deceased was opposed to Lea having children and repeatedly said she would get rid of the above child; that deceased, on various occasions, said she would kill the child, as well as defendant and his wife; that these threats were likewise communicated to defendant by his wife. Lea further testified that she was afraid of deceased, and visited her, as shown by the evidence, because she was afraid not to do so; that she was afraid deceased would kill the child or herself and husband; that these matters were likewise communicated to the defendant; that after learning of these things, defendant was greatly distressed in mind and brooded over them; that he was constantly in a deep study, was absent-minded and was not like he had been formerly; that on October 12, 1919, when he wrote the note heretofore mentioned, he had been awake most of the night, was restless and could not sleep; that this continued until about two o'clock a. m., on the morning of October 13, 1919, when he wrote deceased the foregoing note. Lea further testified that when deceased come to their house about dusk on the evening of October 13, 1919, she told Lea to bring the baby out where she was, near the gate; that deceased asked her where she had been and, on being told that she had been to one of the Allens, the deceased then said, ''Yes, you been to those d'n Allens again have you, I thought I told you not to go about them;'' that deceased then asked for her dress and Lea went after it; that she returned with the dress and gave it to deceased; that the latter then started to take the letter, above mentioned, out of her pocket, and Lea told her she need not do that, as she had already seen it; that deceased then commenced cursing defendant, called him a s——b and asked Lea what she let him write that letter for; that deceased then said she came up to separate defendant and his wife; that if she could not do it one way, she could the other. Lea further testified that deceased then cursed defendant, and after being requested by her to leave, said he, Lea and the baby could not stay together another night; that deceased started

State v. Allen.

to take hold of the child, but she (Lea) moved away and deceased then called him a d———n little brat; that deceased stood there talking in this way, about fifteen or twenty minutes, and defendant came around the east corner of the house; that deceased then asked him why he wrote that letter, and called him a s———b———; that he told her to go away; that she swore again, and said she did not have to; that defendant then asked his wife to go into the house and she did so; that she (Lea) then told defendant that deceased had said she was going to kill him and the baby, and said that she meant it; that defendant then took the shotgun, stepped out doors, told deceased to go away, while she was halloaing and cursing him; that she heard defendant shoot and deceased kept on cursing and halloaing; that she (Lea) stepped to the door, saw deceased standing about the middle of the road, quite a way from the gate, and deceased made a dash for the gate; that she (Lea) stepped right back and heard defendant shoot again.

The appellant testified, in substance, to practically the same facts as did his wife, in regard to what occurred before he went into the house and got his shotgun. He also testified that while he and his wife were at the gate with the deceased, the latter struck at him with the cane, and threatened to knock his brains out, as he went to the house with his wife; that deceased also said at that time that she was going to kill them, and that was what she came for. The defendant testified as follows:

"Q. What did you do? A. I took the gun out and held it to scare her away. I held the gun in my hand this way (indicating) and she came over to the gate and I thought she had a gun, she had something in her hand, and I shot right through the gate."

He testified, that he fired two shots close together without moving the gun; that he told her to go away; that she swore and said, "I am going to get you, that is what I came here for."

The defendant was not cross-examined.

The defendant and his wife were the only parties present at the time of the shooting except the deceased. Other persons appeared on the scene shortly after the shooting, and found the deceased dead, lying near the gate about twenty-five or thirty feet from defendant's house. The dress above mentioned was lying near her, and the cane and her bonnet were close by. She was lying on her face, with part of her chin shot off, and had apparently fallen without any struggle.

A large number of witnesses testified that defendant had the reputation in that community of being a peaceable, law-abiding citizen. Some of the defendant's witnesses testified that deceased had the reputation of being a turbulent and quarrelsome woman.

The State introduced in rebuttal the testimony of defendant's wife, given at the coroner's inquest, which tends to show that she did not relate the facts, in regard to the killing, as she stated them at the trial.

Such other facts as may be necessary, as well as the instructions and rulings of the court, will be considered in the opinion.

I.   Rule 15 of this court, among other things, contains the following:

"The brief for appellant shall distinctly allege the errors committed by the trial court, and shall contain in addition thereto: (1) *A fair and concise statement of the facts of the case without reiteration, statements of law, or argument.*" (Italics ours.)

**Rule 15.**

The statement of appellant's counsel in this case recites, as part of the testimony, matters which were excluded by the court. It is highly colored, and so exceedingly argumentative throughout as to be of little value to the court in making our statement of the case. We have, however, carefully read the transcript, and believe the facts are substantially covered in the foregoing statement.

II.   Appellant's first assignment of error, reads as follows:

"The trial court erred in refusing defendant's offered instruction numbered eleven on manslaughter and erred in failing and refusing to instruct properly on manslaughter."

*Manslaughter.*

The above instruction reads as follows:

"The court instructs the jury that if you believe from the evidence that the defendant intentionally shot and killed Leota Marrs whilst in a violent passion suddenly aroused, by reason of the said Leota Marrs having assaulted and struck defendant with a cane, and by making violent threats to kill defendant or his child, and by making contemptuous and insulting gestures toward defendant, and that said shooting was not in self-defense, as defined in other instructions given, and was not done with malice but was the result of such passion, then you will find the defendant guilty of manslaughter in the fourth degree and assess his punishment at imprisonment in the penitentiary for two years, or by imprisonment in the county jail not less than six months, or by a fine of not less than five hundred dollars, or by both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months."

A large number of Missouri cases are cited in support of above contention.  We have carefully examined each of said cases, and do not find that any of them go to the extent of holding that an instruction on manslaughter should have been given where the circumstances surrounding the transaction were like those in the case before us.

The facts in this case have been very fully stated, and need only be referred to in a general way.

It stands admitted that defendant, less than twenty-four hours before killing deceased, wrote her a letter, in which he said: "I am warning you if I ever catch you put your foot in my yard I will blow your brains out." The wife of defendant testified that she had communi-

cated to defendant, before the killing, the various threats and conduct of deceased heretofore mentioned. The above letter clearly indicated malice aforethought, and must be so construed in considering the law relating to manslaughter. Taking the testimony of defendant, as to what occurred at the time of the shooting, and immediately prior thereto, in connection with the letter aforesaid, we are of the opinion that he was not entitled to an instruction on manslaughter. After warning deceased that he would blow her brains out, if found on his premises, he discovered her in a few hours thereafter, standing in the highway, near his gate, twenty-five or thirty feet from the house, but not on his premises. At the request of deceased, defendant's wife came out near the gate with her child in her arms and remained there fifteen or twenty minutes listening to the talk and threats of deceased. It is not claimed, that the latter made any effort to assault the wife or child with the cane which she held in her hand before defendant appeared upon the scene. Appellant testified that deceased was making threats against his wife, his child and himself after he approached the gate where they were standing. He then describes what occurred there, as follows:

"Well, I come around the corner of the house there; I seen Lea and Mrs. Marrs standing out there west of the house there by the fence, and Lea was on the inside of the fence and Mrs. Marrs was standing on the outside and she was cussing. I heard her say 'G—d d—n him, Lea,' and she said to me, 'D—n you, you thought you would keep me away from here writing that letter, didn't you,' and I said, 'Go on away and let us alone,' and she had her cane in her hand and waved it over her head and said, 'G—d d—n you, I am going to settle this;' I said, 'Come on Lea and go to the house,' and she said, 'Don't you go, Lea,' *and I had the hammer in my hand* and I laid it down and I went to where Lea was and said, 'Come on in the house, Lea,' and she said, 'Don't you go, Lea,' and I laid my hand on Lea's shoulder and she struck at me

with the cane and hit me on the hand, and she said, 'I will knock your darn brains out,' and, as we went to the house Lea said she was going to kill us and she [deceased] said, 'You are darn right I am going to, that's what I come up here for.' " Thereupon the defendant, his wife and child went into the house and left deceased still standing in the highway. The deceased had no gun or other weapon except the cane heretofore mentioned. She did not enter defendant's premises and made no effort to enter defendant's house. While matters were in this shape, the defendant voluntarily resumed hostilities, by leaving the house with a double-barreled shotgun, and shooting deceased twenty-five or thirty feet distant twice, without moving his gun, although she was still upon the highway.

Even if it be conceded that the acts and conduct of deceased before defendant and his family entered the house were sufficient provocation to arouse his passion at *that* time, yet, he then made no effort to assault deceased or do her bodily harm. On the contrary, he retired with his family to a place of security, and without being moved by sudden heat of passion voluntarily returned to the scene of conflict for the evident purpose of shooting his former antagonist, as indicated in the letter heretofore mentioned. The acts and conduct of deceased at the time and place of shooting, as well as prior thereto were insufficient to warrant the court in giving defendant's instruction 11, or any other instruction upon the subject of manslaughter. [State v. Liolios, 285 Mo. 1, 225 S. W. l. c. 946; State v. Hostetter, 222 S. W. (Mo.) l. c. 755; State v. Stenzel, 220 S. W. (Mo.) l. c. 883-4; State v. Davis, 217 S. W. (Mo.) l. c. 92-3; State v. Jones, 217 S. W. (Mo.) 22-3; State v. Stewart, 278 Mo. l. c. 184-5, 212 S. W. 853; State v. Burns, 278 Mo. l. c. 449, 213 S. W. l. c. 116; State v. Borders, 199 S. W. (Mo.) l. c. 183; State v. Vest, 254 Mo. l. c. 464-8; State v. Bostwick, 245 Mo. 483; State v. Barrett, 240 Mo. l. c. 169; State v. Sharp, 233 Mo. l. c. 290.]

290 Mo.—18

The trial court committed no error in refusing to instruct upon manslaughter.

III. In appellant's second assignment of error it is said: "The trial court erred in giving the State's instruc-

Presumption.

tion numbered nine on the presumption of guilt."

The instruction complained of supra, and the one given in State v. Little, 228 S. W. l. c. 797, cited by appellant, are so nearly alike that we have deemed it appropriate to set them out in juxtaposition, as follows:

LITTLE CASE.

"5. The court instructs the jury that he who willfully, that is, intentionally, uses upon another at some vital part, a deadly weapon, such as a shotgun loaded with gunpowder and leaden balls, must in the absence of qualifying facts be presumed to know that the effect is likely to be death, and knowing this must be presumed to intend death, which is the probable and ordinary consequence of such an act; and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly or from a bad heart."

PRESENT CASE.

"9. The court instructs the jury that he who wilfully, that is intentionally, uses upon another at some vital point, a deadly weapon, such as a shotgun loaded with powder and leaden bullets, must in the absence of qualifying facts, be presumed to know that the effect is likely to produce death, and knowing this, must be presumed to intend death as the probable and ordinary consequence of such an act; and, if such deadly weapon is used without just cause or provocation, as defined in other instructions, he must be presumed to do it wickedly and from a bad heart."

The correctness of said Instruction 5 was vigorously challenged by counsel for Little in the oral argument be-

fore this court, in their original brief, and in their brief on motion for rehearing. The matter was fully considered by this court in State v. Little, 228 S. W. l. c. 797, and the correctness of said Instruction 5 sustained, *in respect to facts similar to those before us here*. Numerous authorities are cited in the Little case in support of the conclusion there reached. The main authorities relied on by appellant here were presented to the court in the Little case and, hence, we do not deem it necessary to discuss this subject further.

Said assignment is accordingly overruled.

IV. Appellant's third assignment charges the court with error in permitting the bloody garments of deceased to be exhibited before the jury, and in permitting them to remain there in plain view of the jury, etc.

Exhibition of Bloody Clothes.

We are referred to the page of transcript where appellant's counsel interposed an objection of the above nature, but the record recites the following:

"BY THE COURT: The court is of the opinion that the clothes objected to are not within the sight of the jury and haven't been as they passed in and out, and even the ones that had blood on the attorney objected to are covered by the bonnet and clothing that had no blood on it." The above statement of the trial court recites that the garments of deceased were not exhibited in the presence of the jury during the progress of the trial and, furthermore, that the part which was blood-stained had been covered with other garments on which there was no blood. The court thereupon had said garments removed, and there was no further controversy over this matter. After carefully reading the transcript, we are satisfied that no injustice was done the defendant in respect to above matter.

The facts in the case of State v. Edelen, 288 Mo. 160 and following, were entirely unlike those in the case before us. In the Edelen case, the clothes of the prosecutrix were dramatically exhibited as a part of the cross-

examination in such manner as to brow-beat the defendant and prejudice the jury against him. In this case, it is undisputed that defendant wrote the letter threatening to kill deceased if she came upon his premises, and that he shot and killed the deceased under the circumstances heretofore stated. The jury found the defendant guilty and gave him the lowest punishment which could be inflicted under the instructions of the court. There is nothing in the record tending to show that any improper use was made of deceased's clothing, or that the jury was in any manner prejudiced against appellant. On the contrary, considered from any viewpoint, we are of the opinion that the trial court committed no error of which the defendant can complain in respect to above assignment.

V. The fourth assignment of error reads as follows:

"The trial court erred in refusing to allow the wife of defendant to testify as to what *she* told defendant in the house as to the threats and conduct of deceased immediately prior to their entering the house, and what defendant said when starting out

Res Gestae.

with the gun, as evidence of his intentions, and his state of mind, all of which was a part of the *res gestae*."

The court did not refuse to permit the wife to state what she said before they entered the house, nor what she said after entering same. On the contrary, she testified as follows:

"Q. What did you say after you got in the house? A. I says, 'Frank, she said she come to kill you and the baby, and she means it.'"

The trial court not only admitted the above testimony, but likewise permitted both defendant and his wife to testify as to what deceased said before they entered the house, including the above statement. This part of said assignment is absolutely devoid of merit.

The further point made in respect to the above assignment of error relates to the action of the court in refusing to permit the wife to testify as to what defendant said after they got in the house. The State objected

to the wife testifying as to what the defendant said in the house. Thereupon the following occurred:

'By Mr. Allen: *I don't think we are entitled to what he said, but what she said to him.''* (Italics ours.)

Aside from the admission of defendant's counsel in open court that this proffered testimony was incompetent, the law is too well settled for discussion that the self-serving declarations of the defendant, outside the presence of deceased, are no part of the *res gestae,* and are incompetent for any purpose. Especially so, in a case of this character, where both husband and wife were permitted to testify fully as to all that occurred in the presence of deceased. Self-serving declarations like those sought to be elicited in this case in the absence of deceased, are incompetent in either a civil or criminal case. [O'Day v. Annex Realty Co., 191 S. W. (Mo.) l. c. 46 and cases cited; State v. Cruts, 288 Mo. 107, 231 S. W. l. c. 605-6; State v. Burns, 278 Mo. 441, 213 S. W. l. c. 116; State v. Reeves, 195 S. W. (Mo.) 1030; State v. Anderson, 252 Mo. l. c. 89.; State v. Long, 201 Mo. l. c. 674; State v. Atchley, 186 Mo. l. c. 194; State v. Maguire, 113 Mo. 670; State v. Holcomb, 86 Mo. l. c. 378; State v. Van Zant, 71 Mo. l. c. 543-4.] The above assignment is overruled.

VI. The fifth assignment of error is couched in the following language:

"The trial court erred in refusing defendant's offer of evidence to the effect that, on the day the baby was born, as well as before, she (deceased) did not propose that the baby should live."

**Uncommunicated Threats.**

In support of this assignment, we are referred to the testimony of Mrs. Annis Hall, who testified that deceased had the reputation of being a quarrelsome woman. The witness was then asked if she had a conversation with deceased a few days after the baby was born. She answered that she had a conversation with her on the day it was born. She was then asked to state the conversation, and the State's objection thereto was sustained.

Thereupon, counsel had the record show that he offered
to prove by said witness that she had a conversation with
deceased on the day said baby was born; that she told
witness she had tried at numerous times to get defend-
ant's wife to produce an abortion and destroy said child;
that she also told the witness, that she did not propose
that said child should be raised by Lea Allen.   Counsel
asserted that this testimony was offered to show the
hostile feeling deceased had toward Lea and said child.
It was not claimed that the subject-matter of this con-
versation, if it ever occurred, was communicated to de-
fendant or in any manner operated on his mind at the
time he killed deceased.   The testimony of defendant's
wife, as to the threats, acts and conduct of deceased
about the date of the birth of said child, and at other
times, was admitted in evidence, because she testified
said matters were communicated by her to defendant and,
hence, was proper in considering the provocation which
defendant had in mind at the time of the killing.   The
acts and declarations of deceased communicated to de-
fendant, as well as what she said in his presence, were
given in evidence without objection before the jury.   The
witness testified as to the general reputation of deceased
and was properly precluded from going into *specific acts*
for the purpose of showing her quarrelsome or turbulent
disposition.   What we said in State v. Burns, 278 Mo. 441,
213 S. W. 117, is no authority for the admission of the
above testimony rejected by the court.   The court com-
mitted no error in respect to the above assignment. [State
v. Wilson, 250 Mo. 323; State v. McNamara, 212 Mo. 150;
State v. Punshon, 124 Mo. l. c. 457; State v. Curtis, 70
Mo. l. c. 597.]

VII.   Appellant's sixth assignment (a) reads as fol-
lows:

"The court erred in stating within the hearing of
the jury that: 'Defendant has been on the
stand and don't show in his testimony that it
was in the protection of his wife and child
the shot was fired.' "

Remarks of Court.

We are referred by counsel in their brief, to the testimony of Mrs. Cordia Allen on this subject. Witness was asked to state if she had ever heard deceased say anything about the baby. The State's objection to this question was properly sustained, as shown in the preceding paragraph of this opinion. Thereupon, the following occurred:

"By Mr. ALLEN: I believe that's competent, your honor, on the theory that a man has the same right to protect his wife and child that he has himself.

"By THE COURT: That might be true but the defendant has been on the stand and don't show in his testimony that it was in the protection of his wife and child the shot was fired.    .    .    .

. "By THE COURT: Those remarks of the court are simply indicating to you why the court thought the evidence not competent."

The evidence sought to be elicited from the above witness was incompetent as stated in the previous paragraph. After the court had ruled adversely to defendant, his counsel still insisted on arguing the question with the court, and the statement complained of simply reflected the views of the court as to the incompetency of said testimony. The defendant was examined in his own behalf, but was not cross-examined by the State. He made no explanation of the letter he had written deceased, and did not testify at the trial he had killed her to protect his wife or child. On the contrary, when asked by his counsel as to what he did after leaving the house, he said:

"I took the gun out and held it to scare her away, I held the gun in my hand this way (indicating) and she came over to the gate and I thought she had a gun, she had something in her hand, and I shot right through the gate." The wife and baby were then in the house and were in no immediate danger from deceased.

As heretofore stated, the testimony offered was properly excluded, and the reason assigned by the court for adhering to its former ruling affords no ground for disturbing the verdict in this case.

Under sub-proposition "b" in defendant's assignment of errors complaint is made as to certain statements of the court in reference to the request of defendant's counsel to have the clothes of deceased removed from the presence of the jury.

After most of the testimony had been heard, Mr. Thompson, in behalf of defendant, renewed his objection to the alleged presence of deceased's bloody clothing, etc., before the jury. Counsel for the State asserted that the things objected to were not within the sight or knowledge of the jury. Thereupon, the following occurred:

"By the Court: *The court is of the opinion that the clothes objected to are not within the sight of the jury and haven't been as they passed in and out,* and even the ones that had blood on the attorney objected to are covered by the bonnet and clothing that had no blood on it, and that the court sees no reason at this time, in order to gratify the wish of the attorney while the court thinks no harm done by them, to direct the sheriff to remove them from the court room."

On the record before us we are bound to assume that the recital of the court as to deceased's clothing is true. We are urged, however, to reverse and remand the case because the court said the garments would be moved to gratify counsel making the above objection. In other words, the court, in legal effect held that the garments complained of were not in the presence of the jury, but to please or satisfy counsel the garments would be removed from the court room.

The authorities cited in appellant's brief in support of above contention are not in point. In our opinion the above assignment is devoid of merit.

VIII. Defendant's seventh assignment of error reads as follows:

"The court erred in not giving defendant's instructions 1, 2, 3, 4 and 5, and instruction 11, being approved instructions, on defendant's theory of his case, and erred in its attempt to cover defendant's facts in instructions asked by the State."

Instructions.

Instruction 11, mentioned in this assignment, relates to manslaughter, and was properly refused for the reasons heretofore assigned under proposition two of this opinion.

Without stopping to consider in detail, instructions numbered 1, 2, 3, 4 and 5, asked by defendant and refused by the court, some of which are too argumentative in form, we are of the opinion that upon a careful consideration of instructions 2, 10, 11, 12, 16 and 17, given by the court, they clearly and correctly stated all the law that was necessary for the jury to consider, in passing upon the matters covered by defendant's refused instructions 1, 2, 3, 4 and 5. Where necessary and proper instructions are given, as in this case, the trial court committed no error in refusing others relating to the same subject. [State v. Howard, 231 S. W. (Mo.) 255; State v. Dooms, 280 Mo. 84, 217 S. W. l. c. 47; State v. Cole, 213 S. W. (Mo.) l. c. 113; State v. Bowman, 278 Mo. 492, 213 S. W. l. c. 65; State v. Mastin, 277 Mo. 495, 211 S. W. l. c. 18; State v. Jones, 276 Mo. l. c. 301, 207 S. W. 793; State v. Rose, 271 Mo. l. c. 28, 195 S. W. 1013; State v. Guinn, 174 Mo. 680.]

We have examined with great care, not only the instructions above mentioned, but all of those given to the jury. We are of the opinion that they properly declare the law, and presented defendant's defenses to the jury in a fair and liberal manner.

IX. Appellant's eighth assignment of error reads as follows:

"The trial court erred in admitting in evidence the testimony of Lea Allen, wife of defendant, taken at the inquest and erred in permitting the State to cross-examine her at the trial on her testimony obtained at the inquest; for the reason she was not advised that she may not testify, having then no counsel, but was placed on the stand by the coroner (or State) and compelled to testify."

*Testimony at Inquest.*

It may be conceded, that under Section 4036, Revised Statutes 1919, the wife of defendant could not have been

compelled to testify as a witness before the coroner.  If, however, she testified of her own volition, she was liable to cross-examination, as to any matter referred to· by her and was liable to contradiction and impeachment, as any other witness in the case.   Chapter 48, Revised Statutes 1919, authorized the coroner to hold the inquest over the death of Leota Marrs.   Section 5929, Revised Statutes 1919, required that the testimony taken at said inquest should be taken down in writing and subscribed by the witnesses.   It cannot be presumed, in the absence of evidence on that subject, that the coroner *compelled* defendant's wife to testify against her consent.   The State in rebuttal offered in evidence the testimony of defendant's wife taken before the coroner to contradict the testimony given by her at the trial of this case.   This was objected to by defendant's counsel, for the reason that no showing had been made to the effect that Mrs. Allen had been advised she could decline to testify.  Thereupon counsel for the State said she had been so advised and voluntarily asked permission to go back on the stand, where she gave additional testimony.   The evidence before the coroner was then read and, among other things, recites, at the commencement thereof, that Lea Allen was "first advised and warned that she need not answer any questions or make any statements which might incriminate her husband, Frank Allen."   Thereupon, counsel for defendant asked to have the above statement stricken out, as it was no part of the testimony, etc. This request was overruled.

The record shows that Lea Allen voluntarily testified as a witness without objection, and at her own instance was recalled to enable her to give additional testimony in the case.   We are, therefore, of the opinion that the court was within the law, in permitting Lea Allen to be cross-examined as to her statements before the coroner; and committed no error in permitting the testimony of defendant's wife before the coroner to be read in evidence, for the purposes of impeachment, regardless of the above recital, as it cannot be presumed, in the absence of evidence on the subject, that the coroner as a

State v. Allen.

public officer violated the statute in compelling the wife to testify illegally. [Wells v. Wells, 213 S. W. l. c. 833 and cases cited.]

(a) Aside, however, from the foregoing, as defendant's wife was the principal witness at the trial in his behalf, and testified as to every phase of the case under consideration, she stood upon the same plane as any other witness in the case, and was liable to impeachment in the same way. If she made material statements *out* of court, which were in conflict with what she said at the trial, relating to the merits of the controversy, the State was entitled to show the same, whether made before the coroner or elsewhere. [State v. Smith, 228 S. W. (Mo.) l. c. 1061; State v. Drew, 213 S. W. (Mo.) l. c. 107; State v. Ivy, 192 S. W. (Mo.) 733.]

X. We have read the entire record and briefs in this case with a great deal of care, and have reached the conclusion that the case was well tried, without any error of which defendant can legally complain, and that he was convicted upon substantial evidence by a fair and impartial jury.

Conclusion.

The judgment below is accordingly affirmed. *White* and *Reeves, CC.;* concur.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All of the judges concur; *David E. Blair, J.,* in separate opinion.

DAVID E. BLAIR, J.—I concur in the majority opinion. I think this is a proper case for an instruction on the presumption of malice arising from the intentional use of a deadly weapon upon another at some vital part, for the reason that defendant admitted the intentional use of such weapon, but claimed justification and there were no eyewitnesses, except the defendant and his wife, the latter not being a competent witness against him.

On more mature consideration I am inclined to think this sort of instruction was not proper in the case of

State v. Little, 228 S. W. l. c. 797, cited and approved in the majority opinion, for the reason that the person there assaulted survived the attack and he and his wife testified at the trial to all that took place at the time of the shooting. When the facts were developed by eyewitnesses there was no room for the indulgence of any presumption of malice on the part of defendant by the use of a deadly weapon.