Appellant’s Motion for Rehearing En Banc Granted; Majority and
Dissenting Opinions Issued October 17, 2002, are Withdrawn; Aff















Appellant’s
Motion for Rehearing En Banc Granted; Majority and Dissenting Opinions Issued
October 17, 2002, are Withdrawn; Affirmed on Rehearing and Majority and
Dissenting Opinions on Rehearing En Banc filed August 7, 2003.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-01-00507-CV

____________

 

DRC PARTS & ACCESSORIES, L.L.C., Appellant

 

V.

 

VM MOTORI, S.P.A., Appellee

 

__________________________________________________________________

 

On Appeal from
the 151st District Court

Harris County, Texas

Trial Court
Cause No. 98-24396

 

__________________________________________________________________

 

DISSENTING  OPINION  ON  REHEARING 
EN  BANC

            Regarding the second issue raised by
DRC Parts & Accessories, L.L.C., the majority holds that extrinsic evidence
is, as a matter of law, insufficient to show fraud in the inducement of a
written contract when such evidence is rebutted by the express terms of the
agreement.  The rationale for this
holding is that a party can never “justifiably rely” on oral representations
that are contrary to the express terms of the written agreement.  I respectfully dissent, not because I
disagree with the aforementioned principle as a general statement of the law, but because it cannot be universally applied to all fact
scenarios.  Here, DRC presented substantial summary judgment proof
raising a fact issue regarding whether it justifiably relied on oral and
written representations that conflict with the written contract.  Considering both the terms of the contract
and the circumstances under which it was formed, I do not believe DRC’s summary judgment evidence is insufficient, as a
matter of law.

Proof of “justifiable reliance”

            To prove fraudulent inducement, a
party must show: (1) a false material representation; (2) known to be false or
made without knowledge of the truth; (3) which was intended to be acted upon;
(4) was relied upon; and (5) caused injury. 
Formosa Plastics, 960 S.W.2d 41, 47–48 (Tex. 1998).  The majority
holds the evidence presented by DRC was insufficient to show it justifiably relied on any alleged
misrepresentations.  I disagree.  

            The summary judgment proof shows
that prior to 1995, VM Motori, S.P.A., marketed its
engines, parts, and accessories in North America exclusively through DRC.  In 1995, however, VM was purchased by Detroit
Diesel Corporation which had a vast existing sales network in North
 America.  Nevertheless,
VM Motori/Detroit Diesel retained the services of DRC
and its president, Dale Chambliss, to (1) market some VM products in North America, and (2)
help train and advise Detroit Diesel regarding sales of the VM product line.

            According to Chambliss, VM made a
number of different types of engines. 
Like most manufacturers, the product line changed from year to year—as
new models were added, some of the older versions became “obsolete” and were phased out of production. 
New engine models, however, sometimes incorporated parts from previous
engine models.  Therefore, some
replacement parts were common to both current and obsolete engines—such parts
were known as “common parts,” i.e.,
parts that were compatible with several engine models.

             To support its customer base, VM offered a
supply of replacement parts for both its current and obsolete engines.  Detroit Diesel, however, had limited
knowledge of VM’s obsolete product line and focused
its attention primarily on distributing and improving current production
models.  Thus, according to Chambliss,
after 1995, VM Motori/Detroit Diesel granted DRC the
exclusive right to sell “non-common” replacement parts and accessories for
obsolete engines.  Because “common parts”
were used in current production models (and thus sold and distributed by
Detroit Diesel), they were not included within the ambit of DRC’s
exclusive sales agreement.

            The written agreement between DRC
and VM plainly states that DRC is granted the right to sell parts for engines
“not in current production.”  However, it
just as plainly states that such right is “non-exclusive.”  It is upon this clause that the majority
relies in holding that DRC could not reasonably believe it had been granted an
exclusive right to distribute replacement parts for “obsolete” engines in North
 America.  Nevertheless,
DRC submitted considerable summary judgment evidence of repeated oral and
written representations from VM Motori/Detroit Diesel
that it had such a right.  Moreover, DRC
further contends its reliance on these representations was reasonable, even in
the face of contrary language in the written agreement, because VM Motori
represented that the term “non-exclusive” was included in the contract only to
resolve the problem of distributing “common parts.”  Without such language, Detroit Diesel might be
considered in breach of the agreement when it sold replacement parts for
current engine models that were also compatible with obsolete engines.

            In other words, when VM Motori was acquired by Detroit Diesel in 1995, DRC lost its
exclusive right to market all VM Motori engines and parts in North
 America.  However,
Chambliss claimed that DRC was granted the
exclusive right to market parts (but not common parts) for obsolete engines
that were no longer in production. 
Chambliss explained the new relationship with VM Motori/Detroit
Diesel as follows:

In order to
continue its previous levels of sales of engines and parts in North
 America, VM encouraged DRC and I to participate in the
implementation of a new program involving Detroit Diesel.  VM initiated discussions regarding DRC’s role in the sale of VM products, and how that role
would tie in with Detroit Diesel’s plans for the VM line.  VM suggested that DRC and I provide
beneficial services to VM and Detroit Diesel, including training and providing
technical information regarding the VM product line to Detroit Diesel’s
distributors.  In addition, because
Detroit Diesel had no fixed system for the distribution of VM’s
entire product line, VM suggested an agreement whereby DRC would sell parts for engines which were no longer being
manufactured by VM (“non-current production engines”), and VM engine
accessories; while Detroit Diesel would sell the newer model engines and parts for those
engines.  VM told me on several occasions
that the agreement would provide that all sales of parts for non-current
production engine parts and accessories would be sold exclusively through DRC.

(Emphasis
added).

            Even before the parties signed a new
contract, VM Motori began making arrangements to
channel all of its North American orders for non-production engine parts
through DRC.  On February 8, 1996, Tom Freiwald, the senior vice-president of Detroit Diesel and
the former vice-president of VM Motori sent a
memorandum to VM Motori’s regional vice-presidents
advising them of Dale Chambliss’, i.e.,
DRC’s, new role in distributing parts:

There are
some obsolete VM engine models operating in N.A. that are no longer in
production.  Dale is familiar with these
engines and will become the source of
supply of parts for these out of production engines.  Parts for all current engines will be
supplied by Canton [i.e., Detroit Diesel in Canton, Ohio].  Tony Bonacci and
Dale will be providing additional information about how to order the parts for
the out of production VM engines.

(Emphasis
added).

            Two months later, on April 2, 1996, the Spare
Parts Department of VM Motori sent the following memo
to Chambliss:

SUBJECT:  YOUR NEW CONTRACT.

We are
going to send you, in a very short time, the new contract, issued by VM-Motori, which you will have eventually to sign for
approval.  (Your contract proposal has
been slightly modified).  Meanwhile, as
you know, you are already enjoing [sic] our new favourable [sic] discounts, even if we are still receiving
orders from M&L and Graham Ford (supposed to go through your company).  We wish to remind you that you’ve been
granted such discount in order to let you better operate with other U.S.
customers, therefore, you are kindly requested to approach them from now and
advise them about your new position in U.S.A. 
As soon as you receive and accept the agreement, now under preparation,
then you can start to convey all the U.S. orders
directly to us.

(Underlining in the original).

            Thereafter, on May 9, 1996, just days before the new
agreement was signed, VM Motori sent the following
message from Italy to M&L
(a North American customer):

To:  M&L – To Whom It May Concerned [sic]

Kindly be
advised that as from 1-5-1996 [May 1, 1996] all your spare parts requirements
have to be chanelled [sic] through DDC-Canton-Ohio [i.e., Detroit Diesel] for VM current
engines’ spare parts, through DRC (Mr.
Chambliss) for spares related to VM engines of non current production.

(Italics
added; underlining in the original).

            To Chambliss’ surprise, however,
when VM Motori/Detroit Diesel sent the contract to
DRC, it contained a provision granting to DRC “on a non-exclusive basis . . .
the right to purchase and sell VM diesel engine ORIGINAL SPARE PARTS for engine
series and/or engine model versions not in-current production by VM . . .
.”  Because this language seemed to be
contrary to their oral agreement, Chambliss contacted VM Motori/Detroit
Diesel.  Chambliss states in his
affidavit:

VM finally sent a . . .
distribution agreement to me to execute on behalf of DRC, but it stated that
DRC would have a “non-exclusive” right to purchase parts.  I questioned VM regarding the use of the term
“non-exclusive”, in response to which VM told me that it was necessary to
describe this as a “non-exclusive distributorship” since many parts for
non-current production engines were also used in newer model engines, which VM
would be selling to Detroit Diesel (the “common parts”).  According to VM, the only way to provide for
the common parts would be to grant DRC a “non-exclusive” right to purchase and
sale [sic] parts; otherwise, VM could not sell the common parts to Detroit
Diesel without being in breach of the agreement.  As the use of that term under the
circumstances was reasonable, and in reliance upon VM’s
representations regarding the meaning and effect of the terms of the agreement,
I executed the agreement on behalf of DRC on May 14, 1996.

            Throughout 1996, 1997, and most of
1998, DRC Parts sold parts for non-production model engines in North
 America believing it had the exclusive right to do so.  This belief was justified not only by oral
communications with VM Motori, but also many written
communications.  For example, when the
Parts Manager of Industrial Engine Group of Graham Ford, Inc., (a company
located in Columbus, Ohio) attempted to order parts directly from VM Motori, he was advised by VM Motori
in June of 1996 that “Dale Chambliss of DRC Parts & Accessories had an
exclusive contract for the sale of parts for non-current production VM Motori engines.”

            Thereafter, when DRC Parts
complained to VM Motori regarding certain pricing
policies of Detroit Diesel, it received the following reply on November 18, 1996:

SUBJECT:  New DDC parts prices in U.S.A.

We wish to
inform you that your remarks have been taken in due consideration and we thank
you very much for your interesting report. 
Kindly note that we will contact DDC counterparts directly alerting them
about the problem they are causing to you with their price policy.  At the same time we will warn them to change
their attitude and not to disclose any price or info. concerning
spare parts for obsolete engines to their customers and/or distributors.  We will
definitely remind DDC organization to channel to you all the inquiries or orders
covering spares for no current production engines.

(Emphasis
added).

            VM Motori
appears to have tried to direct requests it received from its North American
customers for non-production engine parts to DRC.  For example, on January 23, 1998, the VM Motori
Spare Parts Department sent the following memo to one of its customers:

SUBJECT:  Big impeller and bearing for SU 1053 Engine

With ref. to your FAX of yesterday, addressed to Mr. Giorgio Govoni, I’m very pleased to advise you as follows:

1) VM part numbers required by your customer are 2.094.0018F (fan) and
4.637.0188A (roll bearing) both available at our warehouse.

2) For the above items and for all your spare parts need concerning VM’s obsolete engines, you should contact for prompt
info and delivery (and reasonable prices) our major customer in U.S.A. who has signed a special contract
with us only for these obsolete engines’ spare parts:  DRC, Attention Mr. Dale Chambliss, PH.
713-4661250 FAX 713-4661320.  DRC will
have these items available

3) For VM
current production engines’ spares, obviously you should refer to DDC Canton as
you know.

(Italics
added; underlining in the original).

            When it appeared that Detroit
Diesel’s other distributors might be selling non-production engine parts to
North American customers, Chambliss complained. 
On March 20,
 1998, he received the following reply, in pertinent part, from VM
Motori’s Spare Parts Department:

. . . DDC has confirmed its engagement in instructing and addressing all the
distributors to DRC for any need they might have for obsolete engines spare
parts.

We trust
DDC distributors will strictly adhere to the above commitment in the future as
they did till now.  We will keep
monitoring the situation in order to avoid any breach of these rules by anyone.

(Emphasis
added).

            However, when it later appeared that
non-production engine parts were being routinely sold by other Detroit Diesel
distributors in North America, DRC
brought this suit for breach of contract and fraud in the inducement.

            I believe the aforementioned
evidence raises a fact issue regarding DRC’s reliance
on alleged misrepresentations that precludes summary judgment.

Sufficiency of the Evidence

            Despite
the aforementioned evidence, the majority holds, as a matter of law, it is insufficient to show fraud in the
inducement because it conflicts with the express terms of a written
agreement.  Courts have struggled with
the issue of whether fraud can be predicated upon misrepresentations that
conflict with the express terms of a written contract.  Indeed, the bench and bar are much in need of
a bright-line rule to clarify the law in this regard, and the rule established
by the majority is bright, well-reasoned, and easily applied by the bench and
bar.  Despite these laudable qualities,
we are not writing on a clean slate, and I believe the majority goes too far.

            The construction of a bright line
rule is difficult because the parol evidence rule and
fraud in the inducement are largely incompatible concepts.  Thus, the tension between these ideas has generated
inconsistent holdings.

Parol Evidence Rule

            The parol
evidence rule is not a rule of evidence, but a rule of substantive law.  Hubacek v. Ennis State Bank, 317 S.W.2d 30, 32
(Tex. 1958).  When a written
contract is complete and unambiguous, the parol
evidence rule bars admission of extrinsic evidence regarding prior or
contemporaneous agreements.  Nat’l Union Fire Ins. Co. v.
CBI Industries, Inc., 907 S.W.2d 517, 521 (Tex. 1995); Sun Oil Co. v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981).  While extrinsic
evidence is admissible to clarify the terms of a contract that is ambiguous or
incomplete, it is only admissible to the extent that it does not contradict the
unambiguous terms of the contract.  See Tex.
Bus. & Com. Code Ann. § 2.202 (Vernon 2002); Lewis v. East Tex. Fin. Co. 146 S.W.2d 977, 980 (Tex. 1941); McPherson v. Johnson, 436 S.W.2d 930,
932 (Tex. Civ. App.—Amarillo 1968, writ ref’d n.r.e.); see also Motorola, Inc. v. Chapman, 761
F. Supp. 458, 463 (S.D. Tex. 1991) (applying Texas law).

            Accordingly, negotiations preceding
a written contract should not displace the terms of the written contract.  Fisher Controls Intern., Inc. v. Gibbons, 911 S.W.2d 135, 141–42
(Tex. App.—Houston [1st Dist.] 1995, writ denied).  When experienced executives represented by
counsel voluntarily sign a contract whose terms they know, they should not be
allowed to claim fraud in any earlier oral statement inconsistent with a
specific contract provision.  Id. at 142.  Otherwise,
contracts would be nothing more than a scrap of paper.  Id.

Fraudulent Inducement

            On the other hand, the essence of a
contract involves a meeting of the minds between the parties to the
agreement.  Solis v. Evins,
951 S.W.2d 44, 49 (Tex. App.—Corpus Christi 1997, no writ).  Thus, for a contract to be formed,
there must be a meeting of the minds as to the same thing in the same sense at
the same time.  Angelou v. African Overseas Union, 33 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2000, no pet.). 
Where one party has been fraudulently induced to execute a written
agreement, no contract exists because there is no meeting of the minds.

            However, fraud can only be shown by
the introduction of extrinsic evidence. 
Thus, the parol evidence rule will not prevent
the use of oral testimony to establish fraud or mutual mistake.  American Imagination Corp. of Texas v. W. R. Pierce & Associates,
Inc., 601 S.W.2d 147, 148 (Tex. Civ. App.—El Paso
1980, no writ).  Accordingly, even
where oral evidence tends to vary, contradict, or add
to the terms of a contract, courts have recognized that such evidence is
admissible to show inducements for executing the written agreement.  Anderson v. McRae, 495 S.W.2d 351, 360–61 (Tex. Civ.
App.—Texarkana 1973, no writ).

Resolving the Conflict Between the

 Parol Evidence Rule
and Fraudulent Inducement

            When
the parol evidence rule and the theory of fraudulent
inducement collide, the majority defers to the parol
evidence rule.  Thus, where evidence of
fraudulent inducement is contradicted by the express terms of a written agreement,
the majority holds the evidence is insufficient, as a matter of law, to satisfy
the element of justifiable reliance. 
Frankly, if we were writing on a clean slate, I might well agree with
the majority’s position.  Certainly, I
recognize that if a defendant can rely on extrinsic evidence (that conflicts
with the express terms of a written agreement) under the premise that he was
fraudulently induced to execute the document, then the parol
evidence rule is eviscerated and a written contract is no better that an oral
one.

            However, as an intermediate
appellate court, our holdings must not conflict or be inconsistent with the
holdings of the Texas Supreme Court, and that court has held that fraud in the
inducement may be established by extrinsic evidence.  See
Santos v. Mid-Center Refrigerator Co., 471 S.W.2d 568, 569 (Tex. 1971)
(holding parol evidence rule will not prevent proof
of fraud or mutual mistake).[1]

            This is not to say, however, that
the mere hint of fraud is sufficient to overcome the plain language of a
written contract.  As with any factual
issue, when the evidence offered to prove a vital fact is so weak as to do no
more than create a mere surmise or suspicion of the fact’s existence, the
evidence is no more than a scintilla and, in legal effect, is no evidence at
all.  Heldenfels Bros., Inc. v. City of
Corpus Christi, 832 S.W.2d 39, 41 (Tex.1992).  Whether the evidence is
sufficient to establish a particular fact (like justifiable reliance), must be
determined on a case-by-case basis.  See Schlumberger Tech. Corp. v. Swanson,
959 S.W.2d 171, 181 (Tex. 1997) (holding that a disclaimer of reliance or
merger clause will not always bar a
fraudulent inducement claim).

            I readily concede that the terms of
a contract may be utilized as persuasive evidence in rebutting an allegation of
fraud in the inducement, and when the express terms of a written agreement
conflict with extrinsic evidence of fraud, the proponent may face an
exceedingly difficult burden in establishing his claim or defense.  In fact, in some situations, the terms of the
contract and the circumstances under which it arose may render the proponent’s
evidence of fraudulent inducement insufficient, as a matter of law.  Id. at 178–81.  However, the
factors which the Supreme Court considered in Schlumberger when assessing the sufficiency of the evidence to show
justifiable reliance included: (1) the terms of the contract, (2) the
circumstances surrounding its formation, (3) whether the parties were
represented by counsel, and (4) whether the parties negotiated the contract at
arm’s length.  Id. at 179–180.[2] 

            Here, the terms of the contract
expressly state that the right granted to DRC was “non-exclusive.”  However, in light of oral and written
representations by VM Motori/Detroit Diesel, both
before and after the formation of the contract, DRC could have justifiably
believed VM Motori/Detroit Diesel’s alleged
explanation that the term “non-exclusive” referred to the type of replacement
parts and was inserted only to prevent Detroit Diesel from being in breach of
the contract when it sold common parts to North American customers.[3]

            Accordingly, DRC’s
summary judgment proof of “justifiable reliance” was not insufficient as a
matter of law.[4]  Thus, a fact issue exists as to whether DRC
was fraudulently induced to execute the contract at issue.  The existence of this fact issue precludes
summary judgment.  For this reason, I
respectfully dissent.

 

                                                                        /s/        J. Harvey Hudson

                                                                                    Justice

 

Judgment rendered and Majority and Dissenting
Opinions on Rehearing En Banc filed August 7,
 2003.  (Justices Fowler and Guzman
joining the dissent.)

En banc.

 

 











            [1]  The Supreme Court has acknowledged that a
“review of the Texas cases on the question reveals conflicting decisions and
indicates a resulting confusion which can hardly be resolved or explained away
with nice distinctions.”  Dallas Farm Mach. Co. v. Reaves, 307
S.W.2d 233, 234 (Tex. 1957).  For example, compare Prudential Ins. Co. of Am. v. Jefferson Assoc., Ltd., 896
S.W.2d 156, 162 (Tex. 1995) (holding a buyer is not bound by a written
agreement to purchase a building “as is” that he was induced to make because of
a fraudulent representation);  Dallas Farm Mach. Co, 307 S.W.2d at 239
(embracing the majority position that parol evidence
is admissible to establish fraud in the inducement even in the face of a
“merger” clause in a written contract);  Edward Thompson Co. v. Sawyers, 234 S.W.
837, 874–75 (Tex. 1921) (one who is entitled to avoid a written contract
because it was induced by fraud is no longer bound by any of its stipulations,
including those relating to representations or guaranties which induced its
execution);  Rapid Transit Ry. Co. v. Smith, 86 S.W.
322, 323 (Tex. 1905) (holding that a contract induced by a promise made in bad
faith is voidable); and contrast with Distributors
Inv. Co., et al. v. H. L. Patton, 
110 S.W.2d 47, 48 (Tex. 1937) (holding that oral representations that
conflict with the terms of a written contract are not admissible to show fraud
because otherwise a written contract would be of no higher dignity than an oral
one);  Billington, et al. v. Vest, 268 S.W.2d 705, 707 (Tex. Civ.
App.—El Paso 1954, no writ) (holding that attaching the label of fraud to the
oral representations does not change their character as inadmissible parol evidence).





            [2]  A slightly different analysis has been used
in assessing the sufficiency of evidence of fraudulent inducement where the
contract is a promissory note.  See Town N. Nat’l Bank v. Broaddus, 569
S.W.2d 489, 491 (Tex. 1978) (holding that to prevail in asserting fraud as an
affirmative defense to a promissory note, the defendant must show some
“trickery, artifice, or device”).  See also Simmons v. Compania
Financiera Libano, 830
S.W.2d 789, 791 (Tex. App.—Houston [1st Dist.] 1992, writ denied); Litton v. Hanley, 823 S.W.2d 428, 430
(Tex. App.—Houston [1st Dist.] 1992, n.w.h.); Tripp Village Joint Venture v. MBank, Lincoln Center, N.A., 774 S.W.2d 746, 749 (Tex.
App.—Dallas 1989, writ denied); Simpson
v. MBank Dallas, N.A., 724 S.W.2d 102, 108 (Tex.
App.—Dallas 1987, writ ref’d n.r.e.);
Friday v. Grant Plaza Hunsville
Ass’n., 713 S.W.2d 755, 756–57 (Tex. App.—Houston
[1st Dist.] 1986, no writ); Tex. Exp.
Dev. Corp. v. Schleder, 519 S.W.2d 134, 139 (Tex.
Civ. App.—Dallas 1970, no writ). 

            The policy behind this heightened proof requirement is to
avoid uncertainty and confusion in the law of promissory notes.  Id. at 492; see also Wagner v. Morris, 658 S.W.2d
230, 232 (Tex. App.—Houston [1st Dist.] 1983, n.w.h.)
(recognizing Broaddus
as a narrow holding restricted to cases with similarly narrow facts); JBV, Inc. v. Barkley, 1997 WL 420785 at
*6 (Tex. App.—Austin 1997, pet. denied) (recognizing the policy behind Broaddus is confined to promissory
notes).





            [3]  As to the other Schlumberger factors, it is unclear from the summary judgment
record whether DRC was represented by counsel during the formation of the
written contract.  It otherwise appears,
however, that the parties negotiated the agreement at arm’s length.





            [4]  See
also Burleson State Bank v. Plunkett, 27 S.W.3d 605, 615–16 (Tex. App.—Waco
2000, pet. denied) (holding jury could find party was fraudulently induced to
enter contract by extrinsic agreements and misrepresentations despite the
inclusion of a merger clause disclaiming any such agreements or
representations); Fletcher v. Edwards,
26 S.W.3d 66, 76–77 (Tex. App.—Waco 2000, pet. denied) (holding that under the
circumstances surrounding the formation of the contract, extrinsic evidence of
fraudulent inducement was sufficient to create a fact issue precluding summary
judgment even though the contract expressly stated the property was being sold
“as is”).