THE STATE v. FRANK CAREY and CHESTER KERR, Appellants.

Division Two, March 20, 1926.

1. **MURDER:** Participants: Conspiracy. Active participation by defendants in the actual assault upon deceased, which resulted in his death, is sufficient to justify their conviction, regardless of any prearrangement or conspiracy between them and the others who inflicted the fatal blow to commit the assault. Evidence, though sharply contradicted, that, in a murderous assault upon deceased

State v. Carey & Kerr.

by a father and two sons, one of the sons, as charged in the information, struck the fatal blow with a pistol, and that the defendants, who had come to the scene in an automobile with the father and two sons, got out of the automobile in the midst of the fight and rendered active and efficient assistance in overcoming and assaulting deceased, is sufficient to make out a case of criminal participation in the fatal affray by defendants, and requires a demurrer to the evidence, in their trial as accessories to the murder, to be overruled.

2. ——: Accessories: Manslaughter: Right of Principal. Where the defendants were charged with aiding, abetting and assisting another in the commission of a homicide, if such other, under the evidence, would be entitled to an instruction upon manslaughter, were he on trial, defendants are entitled to the same instruction.

3. ——: ——: ——: Assault: Fatal Blow in Heat of Passion. Where the information charges murder in the first degree and that Harry Knight killed deceased by striking him on the head with a pistol, and that the defendants were present aiding, abetting and assisting the said Harry in the commission of the homicide, and at the trial it develops that deceased was killed in the course of a fight begun between the said Harry and the deceased, and there is evidence from which the jury might find that deceased brought on the difficulty by striking Harry and knocking him down while he was making no hostile demonstration, and that in the ensuing fight, and as a result of said assault, the said Harry, without malice, intentionally and in the heat of passion, struck the fatal blow, the said Harry, were he upon trial, would be entitled to an instruction upon manslaughter; and if he would be entitled to such instruction, the defendants, in their separate trial as active participants in the fatal assault, upon the production of the same evidence, are likewise entitled to the same instruction. And though such evidence is produced by defendants alone, and the evidence for the State, if believed by the jury, shows that the said Harry was the aggressor and first made an assault upon deceased and persisted therein until he had killed him, yet if the instructions given did not require the jury to believe all of the State's evidence or all of the defendant's evidence, and they might therefore have believed that part of defendants' evidence to the effect that deceased brought on the difficulty and first struck the said Harry, etc., and it is not shown or claimed that either defendant struck the fatal blow, it was error to fail to give an instruction on manslaughter.

4. ——: Manslaughter: Failure to Instruct: Assigned in Motion for New Trial. An instruction upon manslaughter should be given where there is evidence from which the jury might find that the

fatal blow was inflicted by the accused, without malice or premeditation, in the heat of passion aroused by an assault or beating at the hands of deceased; and where such instruction is required by the evidence and is not given, and the court's failure to instruct on manslaughter is expressly called to its attention in the motion for a new trial, such failure constitutes reversible error, although there was no request for such an instruction.

5. **APPEAL:** Exclusion of Evidence: No Proffer. An assignment that the trial court erred in excluding proper testimony offered by appellants is not for consideration upon appeal where the exclusions were not accompanied by offers of proof.

Criminal Law, 16 C. J., Section 1564, p. 760, n. 12; Section 2151, p. 851, n. 69. Homicide, 29 C. J., Section 30, p. 1064, n. 61 New; Section 44, p. 1072, n. 45; 30 C. J., Section 570, p. 323, n. 65; Section 587, p. 333, n. 47; Section 640, p. 394, n. 6 New; p. 396, n. 21 New; Section 653, p. 406, n. 17; Section 656, p. 411, n. 52; Section 713, p. 449, n. 79.

Appeal from Henry Circuit Court.—*Hon. C. A. Calvird,* Judge.

REVERSED AND REMANDED.

*Irwin & Dunn* and *T. S. Mosby* for appellants.

(1) The point having been saved by proper exception, it was error for the court to fail to instruct on all the law of the case whether requested to do so or not. R. S. 1919, sec. 4025; State v. Conway, 241 Mo. 271; State v. George, 214 Mo. 262; State v. Kilgore, 79 Mo. 546; State v. Branstetter, 65 Mo. 149; State v. Vinso, 171 Mo. 578; State v. Stonum, 62 Mo. 596; State v. Taylor, 118 Mo. 152; State v. Jones, 61 Mo. 232; State v. Douglas, 258 Mo. 289; State v. Gurnee, 309 Mo. 6; State v. Turlington, 102 Mo. 642; State v. Douglas, 81 Mo. 231. (2) The court's attention having been called at the time to its failure to instruct upon manslaughter, the point may now be successfully urged on appeal. State v. Chenault, 212 Mo. 132; State v. Weatherman, 202 Mo. 6; State v. James, 216 Mo. 394; State v. West, 202 Mo. 128; State v. Espenschied, 212 Mo. 215; State v. Golsbery, 215 Mo. 48; State v. Conway, 241 Mo. 271; State v. Todd, 194 Mo. 393; State

v. McKenzie, 178 Mo. 423; State v. Weakly, 178 Mo. 423; State v. Darling, 199 Mo. 170. (3) The passion which will reduce homicide to manslaughter is an excited state of mind produced by some lawful provocation, such as a blow or an assault upon the person. State v. Todd, 194 Mo. 377; State v. Darling, 199 Mo. 168; State v. Sebastian, 215 Mo. 58; State v. Curtis, 70 Mo. 594; State v. Gassert, 65 Mo. 352; State v. Stewart, 278 Mo. 177; State v. Conley, 255 Mo. 185; State v. Bates, 239 Mo. 507; State v. Grugin, 147 Mo. 39; State v. Heath, 221 Mo. 565; State v. Gee, 85 Mo. 647; 1 Wharton, Crim. Law (10 Ed.) sec. 480. There can be no question, that had Harry Knight been on trial in this case he would have been entitled to a manslaughter instruction; and the point is here made that the element of manslaughter being in the case, these defendants were entitled to an instruction on that point, the status of an accessory being identical with the status of the principal. (4) Mere presence at the scene of the homicide would not render the defendants liable as accessories or otherwise, nor would mere consent. State v. Crittenden, 191 Mo. 17; State v. Cox, 65 Mo. 29; State v. Orrick, 106 Mo. 111. (5) In a case depending mainly on circumstantial evidence, the want of motive is an important consideration bearing upon the probability of guilt. State v. Heusack, 189 Mo. 295; State v. Francis, 199 Mo. 671; State v. Barrington, 198 Mo. 23.

*North T. Gentry,* Attorney-General, and *Harry L. Thomas,* Special Assistant Attorney-General, for respondent.

(1) The evidence was sufficient, there being direct and positive evidence that both appellants were present and active participants in the murder. (2) If an instruction on manslaughter was necessary and was required by the evidence, the error in failing to so instruct is properly saved for review. State v. Burrell, 298 Mo. 672; State v. Knight, 278 S. W. 1036. (3) No man-

slaughter instruction was required by the evidence. Where there is evidence to raise a presumption of malice and to permit evidence of provocation to be disregarded, no such instruction is required. State v. Stewart, 278 Mo. 177. Further there was no personal violence toward the defendants. State v. Delbono, 268 S. W. 61. (4) The measure of an accessory's guilt is not an issue in this case. Under our statute, the defendants were principals and not accessories. R. S. 1919, sec. 3687. (5) Appellants were not only present, but were shown by the evidence and found by the verdict to be actual participants. Where one is present by preconcert, he may be responsible for the criminal act. State v. Crabb, 121 Mo. 554. (6) There was no request for an instruction or assignment in the motion for a new trial relating to an instruction upon the lack of motive. No instruction was necessary, therefore, and in its absence the question of motive was one of fact passed upon by the jury.

BLAIR, J.—Appellants were convicted of murder in the second degree for the killing of one George McCormick. They were sentenced upon the verdict to imprisonment in the penitentiary for fifteen years and have appealed.

This is a companion case to State v. Harry Knight, 312 Mo. 411, 278 S. W. 1036. The homicide occurred at Holden, in Johnson County, on June 23, 1923. The information charged murder in the first degree and alleged that Harry Knight killed McCormick by striking him upon the head and body with a pistol, and that Guy Knight and appellants were present aiding, abetting, assisting, etc., said Harry Knight in the commission of said homicide. A change of venue was granted to Henry County. A severance was asked and awarded, and appellants were tried together, but separately from the Knights.

The facts are quite similar to those stated by Judge RAILEY in the case of State v. Harry Knight, supra. George McCormick and his family and Ben Knight and

his family were neighbors living upon adjoining lots or tracts in Holden. So far as shown by the record, the family of George McCormick, to whom we will refer as the deceased, consisted of himself, his wife Ruth, his son Lowell and his daughters Odessa and Elsie. Ben Knight had a wife, Mollie, and at least three sons and a daughter. The sons were Harry, Guy, Ben, Jr., and the daughter was Eunice. It is not entirely clear that Guy and Ben, Jr., lived at home, but they apparently did. Harry lived in Kansas City, Missouri. He had formerly lived at Holden.

Both families seemed to have engaged, to some extent, in agricultural pursuits, and Ben Knight, or his son Guy, owned some hogs whose frequent depredations had interfered with the garden of the deceased. The hogs had escaped several times and had wrought havoc in the McCormick garden. Deceased had caused the death of at least two of the hogs which he found thus trespassing. The killing of these hogs caused trouble and threats of personal violence. It appears that deceased was not satisfied with killing the hogs, for he caused the arrest of Guy Knight because he failed to dispose of the carcass or carcasses to the satisfaction of deceased.

Such was the status of affairs on June 23, 1923. On that day Guy Knight was in Kansas City. It seems that he had some checks outstanding and it was necessary for him to raise money to meet them. He also had several criminal charges pending against him requiring that he give bail to retain his liberty. Guy Knight claimed that he went to Kansas City to secure the aid of his brother Harry in these matters.

The State's theory appears to be that Guy went to Kansas City to get Harry to assist in handling in a satisfactory manner the difficulty in which he and his father were involved with the deceased. Some color is furnished to this theory, by reason of the admission of Guy himself that he and the deceased had an argument and almost a physical encounter at the division fence on Thursday before the occurrence of the homicide on Saturday evening.

At any rate, Harry and Guy Knight were preparing to drive from Kansas City to Holden shortly after noon on Saturday. They saw the appellants at that time and agreed to take them to Holden with them. They drove rapidly. Harry was at the wheel, according to appellant's witnesses. There is some testimony that appellant Carey, who disclaimed ability to drive an automobile, was at least driving part of the time and bought and paid for gasoline *en route.*

In Kingsville, about six miles west of Holden, the automobile party encountered Ben Knight, who had ridden there on horseback and who had spent several hours in that village. They took Ben Knight in the automobile with them, and the party drove rapidly toward Holden and arrived in Holden about six o'clock. The automobile was driven a little past deceased's house and was stopped in front of his lot. There is no substantial dispute about the foregoing facts. From that point there is a wide divergence in the testimony.

The evidence offered by the State tended to prove that Harry Knight got out of the automobile at that point and called to the deceased, who was on the back porch of his house. Deceased came out at once and walked to the sidewalk. Harry asked him something about the killing of the hogs and made a move as though reaching for his pistol. Deceased promptly knocked Harry down. Guy then got out of the automobile and took up the fight with the deceased in aid of his brother Harry. Appellants then got out of the automobile and went to the assistance of Harry and Guy Knight. The combatants struggled around the yard and into the edge of deceased's potato patch. One T. D. Smith, who was present at the deceased's home when he was first called out by Harry Knight, picked up a poker and attempted to intervene, when Harry Knight threatened him with his pistol. Smith retired to the porch and picked up a hammer and again sought to come to the aid of deceased. He was again threatened by Harry Knight. In the meantime deceased's

son Lowell had hurried home from a neighbor's. By this time deceased's assailants, including appellants, had succeeded in tripping him and in getting him down and were kicking and beating him. Harry Knight then struck deceased over the head with his pistol. This was the fatal blow. Lowell McCormick seized his father's shotgun and inserted the only shell he could find and went to the door just as Ben Knight started from the automobile with a Stilson wrench in his hands, saying in substance, "If you cannot finish him, I will." As Ben Knight approached deceased lying on or near the sidewalk, Lowell fired at him and struck his body near the hips. Harry and Guy Knight helped their father either into the automobile or upon the running board, and the two Knights and the appellants got into the car and drove in front of Ben Knight's home. They then assisted him out of the automobile and laid him on the grass and drove rapidly away. Guy Knight shortly afterwards returned and was arrested in Holden.

The evidence offered by appellants tended to show that the automobile was being driven toward the Knight home when Mrs. Knight and Eunice were seen out in the street endeavoring to prevent the escape of several young hogs which had escaped from the hog lot. Harry stopped the automobile and got out to help head off the hogs. As he did so he saw deceased and spoke to him, and deceased declared he was about to "clean up" or "mop up" the Knights. Harry had not called him from the house. Deceased immediately struck Harry and knocked him down and rendered him unconscious. Harry Knight did not draw any pistol and had no pistol in his hands at any time. Guy Knight then got out and entered the fight with deceased. Ben Knight got out of the automobile with the wrench and ran Smith away. He then struck deceased over the head with the wrench, thus inflicting the fatal blow. Ben Knight was then shot by Smith, not by Lowell McCormick, as the State's evidence tended to prove. Carey and Kerr, the appellants, did not get out of the

automobile at any time or take any part in the fight. They never had any trouble with deceased, bore him no ill-will and did not know of any plans on the part of the Knights to have trouble with the deceased. Carey had lived in Holden and knew deceased, but Kerr did not even know him.

Appellant Carey testified as a witness. Appellant Kerr did not take the witness stand. Guy Knight was also a witness for appellants. Several witnesses testified that the reputations of Guy Knight and Frank Carey for truth, veracity and general morality were bad. The reputation of appellants' witness Knapp was likewise assailed. No character testimony was offered by appellants.

One of the sharpest conflicts in the testimony developed as to the presence of the hogs in the street and pursuit of them by Mrs. Knight and her daughter. The evidence on the part of the State tended strongly to show that there were no hogs in the street or road at all. That of appellants was to the contrary. The presence of the hogs was important, because it furnished a plausible explanation for the stopping of the automobile in front of deceased's premises and near his house.

It is undisputed that, as soon as Ben Knight was laid upon the grass in his own yard, Harry Knight, Guy Knight and the appellants drove rapidly away. Guy Knight returned, however, for the purpose of looking after his father, who at the time expressed the thought that he was not seriously hurt. Harry Knight and the appellants left Holden immediately. There is some testimony tending to show that Harry telephoned from Kansas City to his home that night and inquired about his father's condition. He was later arrested in Mobile, Alabama. The appellants were arrested in Kansas City, Kansas. Appellant Carey gave the fear of arrest as his reason for leaving the scene of the trouble.

Ben Knight died from his wounds at ten o'clock that night, or about four hours after he was shot. George Mc-Cormick died at about three o'clock the following morn-

ing. The evidence tended to show that he had received not only the fatal head injury, but that his body and head were bruised and wounded in many places. This physical condition corroborated the State's witnesses concerning the severe beating administered to him at the hands of his numerous assailants.

The following are the most important conflicts in the testimony: The State's testimony tended to show that there were no hogs in the street to account for the stopping of the automobile in front of deceased's premises, and that the fatal blow was struck by Harry Knight, as charged in the information, and that appellants got out of the automobile and rendered active and efficient assistance in overcoming and assaulting the deceased in the magnificent fight he was putting up against great odds and overpowering numbers. On the other hand, appellant's evidence tended to show that the hogs were in the street and that Mrs. Knight and her daughter were attempting to drive them back; that Harry Knight got out to help head off the hogs; that he spoke to deceased and was assaulted by him and knocked down and rendered unconscious and did not get up until the fight was over; that Ben Knight, and not Harry Knight, struck the fatal blow and that appellants never got out of the automobile at any time during the fight.

It is manifest from the foregoing statement of facts that the State's evidence tended to make out a case of criminal participation in the fatal affray by both of the appellants. The demurrer to the evidence offered by the appellants was properly overruled. The active participation by appellants in the actual assault, if believed by the jury, was sufficient to justify their conviction regardless of any prearrangement or conspiracy between appellants and the three Knights to commit an assault upon the deceased. There are facts in evidence which are consistent with the existence of a conspiracy. Such facts are, however, likewise consistent with the theory that there was no conspiracy. The trial court gave no con-

spiracy instruction and was evidently of the opinion that such an instruction was not justified by the evidence.

The most serious question in the case is the failure of the trial court to give an instruction upon manslaughter. For the reason that the information charged that Harry Knight struck the fatal blow and that appellants were present aiding, abetting and assisting him in the commission of the homicide, the court correctly instructed the jury to acquit appellants if Ben Knight and not Harry Knight struck the fatal blow. There is no evidence that either of the appellants struck a blow which could have been the fatal blow. They could only be convicted under the information if the jury found that Harry Knight struck the fatal blow and they were aiding, abetting and assisting him therein.

When Harry Knight was on trial for this homicide, the same trial judge gave an instruction on manslaughter upon evidence which seems to have been substantially the same as was given in the trial of this case. [State v. Knight, 312 Mo. 411, 278 S. W. l. c. 1040.] We did not there consider the propriety or necessity of giving a manslaughter instruction. The fact that it was given was merely recited in the opinion. Appellants were charged with aiding, abetting and assisting Harry Knight in the commission of the homicide. They could not be guilty of a graver crime than that of which Harry Knight was guilty. If Harry Knight, under the evidence in this case, would have been entitled to an instruction upon manslaughter, had he been on trial, appellants were entitled to the same instruction. [State v. Casey, 207 Mo. 1, l. c. 12; State v. Hayes, 105 Mo. 76; State v. Hayes, 262 S. W. (Mo.) 1034, l. c. 1037; State v. Recke, 278 S. W. (Mo.) l. c. 998.]

Our inquiry then is whether there was evidence in the case which tended to show that the act of Harry Knight, assuming that he inflicted the fatal blow, was manslaughter rather than murder. We think there was such evidence. If the jury had been required to believe all of the State's evidence or all of the appellants' evi-

dence, some difficulty might arise. There was no such requirement. The jury had the right to believe all or only part of the testimony of any witness or witnesses. [State v. Williams, 274 S. W. 50.]

The jury might have believed part of the story told by appellants and their witnesses and might have disbelieved part of it. It might have accepted the story of the State's witnesses in part and rejected such story in part. That is to say, the jury might have believed, as it did, that Harry Knight inflicted the fatal blow, and yet might have found that the deceased brought on the difficulty by striking Harry Knight and knocking him down while he was making no hostile demonstration; that a fight thereafter ensued as a result of such assault and that, in such fight and without malice aforethought and without premeditation, Harry Knight intentionally and in the heat of passion delivered the fatal blow. There was therefore evidence from which the jury might have found Harry Knight to be guilty of manslaughter, had he been on trial. Appellants were entitled to the same instruction, since there is no evidence and it is not charged that they or either of them inflicted the fatal blow. Their guilt lay in aiding, abetting and assisting Harry Knight in the commission of the homicide.

There can be no question under our previous rulings that an instruction upon manslaughter should be given where there is evidence in the case from which the jury might find that the fatal blow was inflicted by the accused without malice aforethought or premeditation in the heat of passion aroused by an assault and beating at the hands of the deceased. Our reports are full of cases adhering to this rule. It is sufficient for our purpose to refer to State v. Conley, 255 Mo. 185, and State v. Stewart, 278 Mo. 177, where numerous cases are cited and considered. The failure of the trial court to instruct upon manslaughter was expressly called to its attention in the motion for new trial and the failure to give such instruc-

tion constituted prejudicial error and requires that appellants be granted a new trial.

There are numerous other assignments of error, but we do not deem it necessary to consider them at length. The assignment based upon the admission of alleged improper testimony appears to be without substantial merit. The several exclusions of alleged proper testimony offered by appellants were not accompanied by offers of proof and such assignments are not before us. The trial court was exceedingly fair in its instructions given to the jury, with the exception of its failure to instruct upon manslaughter. A number of instructions offered by appellants were refused. With the exception of those attempting to submit the issue of manslaughter, there appears to have been no error in their refusal. We deem it unnecessary to consider any other assignment.

The judgment as to each of the appellants is reversed and the cause remanded for another trial. All concur.