THE STATE v. JOHN BONGARD, Appellant.—51 S. W. (2d) 84.

Division Two, June 10, 1932.

*Herbert H. Blair* for appellant.

806

*Stratton Shartel,* Attorney-General, and *Albert Miller,* Assistant Attorney-General, for respondent.

ELLISON, J.—The appellant was convicted by a jury in the St. Louis City Circuit Court of assault with intent to kill with malice aforethought, under Section 4014, Revised Statutes 1929, and his punishment assessed at imprisonment in the State penitentiary for twenty-five years. He shot the prosecuting witness, James Squires, in the jaw and neck with a .45 caliber revolver, the wound not proving fatal. His defense was self-defense. The assignments raised in the motion for new trial and on this appeal complain of the admission of certain testimony on behalf of the State, and the refusal of the trial court to withdraw it from the consideration of the jury; of the failure to give instruction on all the law of the case, particularly felonious assault *without malice;* of certain remarks made by the assistant circuit attorney during his closing argument; and that the heavy punishment assessed by the jury conclusively indicates passion and prejudice.

808

The appellant, age thirty, was a plasterer laborer, and the prosecuting witness, thirty-nine years old, was a plasterer and had also engaged in business intermittently for some time as a plasterer contractor. They had been acquainted about a year and a half, and after November, 1929, this acquaintance ripened into a friendly intimacy. In the latter part of January, 1930, the prosecuting witness, Squires, resided at 4361 Loughboro Avenue, St. Louis, in a residence which had two sleeping rooms on the second floor, living quarters on the first floor, and a basement. Squires had purchased the property in July, 1928, and taken title in the name of himself and his wife. The purchase price was $4,900 and they owed thereon about $3,200 secured by a deed of trust.

After Squires had testified to the foregoing facts without objection in answer to numerous questions, the (then) counsel for appellant interposed: "At this time I want to introduce an objection on the theory that up until this time all the questions and answers be stricken from the record as wholly and solely immaterial and irrelevant." Counsel went on to elaborate that the information specifically charged a felonious assault on February 27, 1930, and anything occurring before that had nothing to do with the case. The court overruled the objection for the time being, awaiting to see whether the evidence would be connected with the crime charged.

The complaining witness Squires proceeded to state that about January 30, 1930, the appellant came to him with a proposition to go into business together and, by the use of capital which the appellant said he could obtain, to buy material in carload lots and handle bigger jobs. They entered into a verbal agreement and about February 4 or 5 the appellant moved into Squire's home with him. At that time Squires was living alone, a divorce suit between him and his wife being then pending. Shortly thereafter the appellant put up $500 which was turned over to one of the attorneys in the divorce case. Appellant's counsel made strenuous objection to this testimony, and renewed his motion to strike out all evidence concerning matters occurring before the date of the alleged assault, especially the divorce case. The objection and motion were overruled.

Squires, testifying, went on to say that about 6:30 in the morning of February 27 while sleeping in one of the bedrooms on the second floor, he was awakened by the appellant and told to put on his jeans and slippers and go downstairs to the front door; that someone wanted to see him. He did so but found no one there. As he faced about to ask where the caller was the appellant confronted him with a .45 caliber automatic pistol and compelled him to go into the dining room, sit down at a table, and write a paper which the appellant dictated assigning to the latter all his business property and equip-

ment, valued at about $1225, which was itemized in the instrument. The writing paper was obtained from a desk in the corner of the room and the appellant produced an indelible pencil from his pocket. The paper was not introduced in evidence.

Following that, the appellant directed him to go down to the basement and threatened to shoot him if he refused. Squires obeyed and the appellant compelled him to sit in a chair and put his hands behind his back. The appellant then said "now you —— —— I am going to kill you." Squires protested but the appellant nevertheless fired one shot from a distance of six to nine feet, the bullet striking him in the jaw and coming out the back of his neck.

Squires says he threw himself on the floor as if dead, whereupon the appellant went back upstairs to the kitchen, leaving him lying on the basement floor. He got up, fled out a side door and along a driveway to the street, and across the street to the home of officer Oesterreicher of the St. Louis police force. There he hammered on the door but no one responded. Presently, however, another officer, named Wynn, came down the street in an automobile and Squires went out to him. He was taken to the City Hospital.

On cross-examination of Squires the fact was elicited that at the time of the shooting the appellant was wearing his work clothes; and he was asked if breakfast was not in course of preparation, the coffee on the stove, etc. These facts the witness denied in part and in part could not remember. He was also closely cross-examined about writing the assignment, or bill of sale, and as to what became of it; about the arrangement of the rooms, stairway and basement of the house, and the location of the tables and chairs which figured in his story; about the circumstances of the shooting, and his movements thereafter; about his conferences with the circuit attorney's office, and concerning his failure to appear on some former occasion when the case was set for trial, which resulted in the court's issuing an attachment for him.

In particular, appellant's counsel pressed Squires to answer whether a certain butcher knife produced in evidence was not one of the kitchen utensils in his home; and whether or not just before the shooting he had not said to appellant "you dirty —— how long are you going to stay on that job," and then, with the knife in his hand, pursued the appellant from the kitchen to the basement where the shot was fired. The witness admitted the knife belonged in his home, but denied he had seen or used it that morning, and denied emphatically that he had provoked the assault or used the language attributed to him.

Officer Oesterreicher testified that he lived across the street from Squires, and that about 6:30 in the morning while he was taking a bath his wife called to him and told him Squires was at the front

door and that he had been shot. The officer called police headquarters and the Mounted District and hurriedly dressed and went out. When he reached the street another policeman was already there and had charge of Squires. Officer Oesterreicher went over to the Squires home at once. He saw no evidence that breakfast had been in course of preparation.

. · Officer Wynn, who, as stated, was the first policeman to reach the scene, said that while standing on Kingshighway about a half mile west, he was notified of the shooting by a passing motorist. He got a newspaper boy driving an automobile to take him to the address given and found Squires on the steps in front of officer Oesterreicher's home. Someone pointed out Squire's house, across the street, as the place where the shooting occurred, and officer Wynn went in. The appellant met him at the door and admitted he was the one who fired the shot. The appellant backed up as the officer walked forward, and in the front room on a table he found a "gun," cocked and ready to be fired again, · with one empty and four loaded shells in it. The assistant district attorney here produced the "gun" (being the pistol heretofore mentioned) which the officer identified, and it was marked "State's Exhibit A."

Part of the foregoing was developed on cross-examination and by further cross-examination it was shown the appellant had on his work clothes at the time; that after he had been taken to the police station and locked up officer Wynn, and others, returned and found the bullet which pierced Squire's neck, in the basement behind a closet, and the place where it had struck the wall. There were a table and a chair in the basement. The chair was not close enough to the table for one to sit on the former and put his elbows on the latter. In front of the chair was a pool of blood. These were probably eight or ten feet from the table. (But Squires did not say he had sat at a table in the basement and written the assignment. He said this was done on the first floor, upstairs.) The officer said he noticed some cooking utensils on the stove that morning but didn't observe whether they had been used.

The appellant testified that on the morning of the shooting he had got up about six o'clock, prepared breakfast, and was putting a Thermos bottle of coffee in his lunch box when Squires walked into the kitchen and said "How long is it going to take you ———— (an unprintable vile name) to get done over there," referring to a job on which they were engaged. Appellant says he replied it would take about two days, and Squires rejoined if he were there it would be done in one day and again several times called appellant the vile name aforesaid and picked up the knife Squires had identified in his testimony, which was lying on the drainboard of the sink. Appellant

says he refused to fight but that Squires declared he was going to stick the knife through him and chased him into the basement, where he (appellant) knew the pistol previously introduced in evidence was lying on a table. His work clothes, he said, had no pockets large or deep enough to carry the weapon concealed; and he explained the pistol had been left in his care by another man who was having trouble with his wife.

In the basement he snatched up the pistol and threatened to shoot Squires if the latter did not drop the knife, but Squires, apparently drunk, replied "I ain't afraid of that dam pistol, I am going to kill you, you ————;" and from a crouching position by a pillar a few feet away moved as if to lunge at appellant, whereupon the appellant shot him. Appellant declared on cross-examination that he didn't want to shoot Squires, and did so only because Squires had him cornered and was about to assault him with the knife; that he did not make his escape through the basement door (as Squires did later), because it was locked. Leaving Squires on the basement floor, the appellant went upstairs carrying the pistol in his hand and laid it on the table in the dining room where it was found by the police. Then he called police headquarters and reported he had shot a man, following which an officer arrived in about five minutes.

Regarding Squires' execution of an assignment or bill of sale, the appellant denied it had occurred at the time of the shooting but asserted a transaction of this nature did take place about a month previous after he and Squires had been to the office of a lawyer whose name he mentioned, but who was not produced as a witness. He testified that one evening at supper Squires spoke up and said " 'I owe you lots of money so I am going to sign this statement here to you so you will be protected,' he says, ' I know I am going to get killed some day.' " No lawyer or other third party was present and Squires, himself, wrote out the assignment. Further on the appellant testified that back over some period of time he and Squires had been quarrelling over the money Squires owed him, and that on the Sunday before the shooting he offered to settle for $1000. Squires replied that he couldn't pay until he earned the money, and that he was not going to work. This testimony is a little obscure.

Appellant produced only one other witness, a policeman named Anderson, who stated that on the morning of the shooting he got a call to go to the Squires address on Loughboro Avenue. He made a search and found the butcher knife, heretofore mentioned, in the *basement* on the floor under the edge of a table. There was also a chair over by a post, some four or five feet distant from the table. He went to the basement looking for the knife because the appellant told him it was there. The trial court refused to let the officer tell what

further the appellant said, but the evidence does disclose he showed the knife to the appellant and took it to the police station where it was marked and kept as an exhibit for use in the trial of the case.

. In rebuttal the complaining witness, Squires, took the stand and denied having had or used the knife on the day of the shooting, and further denied *in toto* appellant's version of the assault.

I. Appellant's first assignment of error is that the testimony of the complaining witness Squires concerning his prior acquaintance and business relations with the appellant, and about the appellant's having advanced $500 for use in the pending divorce suit between Squires and his wife, was irrelevant and the admission thereof consequently reversible error. On this point appellant refers us to State v. Huff, 161 Mo. 459, 495, 61 S. W. 900, 911, and State v. Jackson, 95 Mo. 623, 649, 8 S. W. 749, 760.

Usually, where causes have been reversed and remanded on that ground, it will be found some prejudicial inference or implication arose from the evidence erroneously allowed to go in, as was true in both the cases cited. More often than not the mere irrelevance of evidence wrongfully admitted over objection is not regarded by our appelate courts as sufficient to make the error reversible—though we do not mean to say the practice can be carried to the point of impeding the trial and obscuring the real issues. The matter rests largely within the discretion of the trial court. In the instant case there was not much testimony of the character objected to, and besides, it did have a certain relevancy. The State's version of the assault was that the appellant compelled Squires, at the point of a pistol, to execute a bill of sale and then shot him. Evidence tending to show why he did it— the fact that Squires owed him a substantial amount and that there was friction between them—tended to throw some light on the main issue. The State's evidence along this line was not as fully developed and connected with the shooting as it might have been—probably because, as the record indicates, the assistant circuit attorney was diverted and driven off by the objections of appellant's counsel. But it was amplified some by appellant's testimony on cross-examination. and we cannot say the trial court committed reversible error, or error at all.

Appellant suggests there may have been some members of the jury who had religious or other scruples against any resort to our divorce laws; that this fact may have prejudiced the appellant in their minds; and that he had no opportunity to interrogate them on their *voir dire* examination concerning their views on divorce. But we cannot see how or why appellant's remote connection with the divorce proceeding would put him in a bad light before the jury. He merely loaned

Squires $500 which the latter, with his knowledge, used in the divorce case. It was not shown whether the husband or wife instituted the suit, or that appellant took any part in it except to loan the money. The incident bore on the case only indirectly. Causes ought not to be reversed for reasons so insubstantial. Since we have held the admission of the evidence was not error, it follows that the refusal to strike it out on motion likewise was not substantial error—especially in view of the fact that a considerable part of it went in without objection in the first instance. There is no merit in the assignment.

■ ■ II. The next error assigned is that the trial court failed to instruct on all the law of the case. The specific point urged in the motion for new trial and here is that the testimony given by appellant that Squires provoked the difficulty, called him vile names, threatened then and there to kill him, and, armed with a butcher knife, closely pursued him from the kitchen into the basement and was about to lunge at him with only a few feet separating them, when appellant fired the pistol—it is urged, we say, that this testimony made a prima facie case of adequate provocation entitling appellant under Section 4452, Revised Statutes 1929, to an instruction on the lesser offense of felonious assault without malice in violation of Sections 4015 or 4016, Revised Statutes 1929. Appellant maintains the offensive language coupled with the demonstrative assault with a deadly weapon threatening imminent danger, was sufficient to constitute lawful provocation though there was no personal violence—no battery.

There are few Missouri decisions on the question, as applied to prosecutions for felonious assault. But as malice is the essential ingredient of murder distinguishing it from manslaughter, and since malicious assault resulting in death is murder, authorities considering what provocation is sufficient to reduce the grade of a homicide from murder to manslaughter are in point and may be looked to. The italics in the quotations hereinafter appearing, are ours.

Appellant's contention seems to be supported by the textwriters. In 2 Bishop on Criminal Law (9 Ed.), section 704, page 537, the statement is made that "Where there is a demonstration of impending present violence, insufficient alone, accompanying words, added to the physical acts, may disclose such peril as will justify the killing of the aggressor, or reduce it to manslaughter." Wharton on Homicide (3 Ed.), section 173, page 277, says foul and opprobrious words in connection with vexatious acts and conduct and all the circumstances of the case have been held to make a jury question as to whether there was adequate provocation, and then continues: "This is the rule with reference to abusive language accompanied by an advance with a drawn knife." In the footnote to this text, however, the following

appears: "But provocation by mere words is insufficient to reduce homicide from murder to manslaughter, though accompanied by the drawing of a knife, where no attempt was made to use it," citing Edwards v. State, 53 Ga. 428. And the doctrine as given in 29 Corpus Juris, section 120, page 1137, is that "It is not always necessary that a · blow shall actually have been struck, but it is sufficient if deceased was evidently about to strike defendant. Apparent imminent danger of personal violence is adequate provocation"—the defendant's apprehension of such danger being reasonable. One of the decisions cited under this text is State v. Brown, 64 Mo. 367, 373, 374..

This Brown case seems to sustain the foregoing for the trial court there gave an instruction that no mere words, however indecent and provoking, are sufficient to reduce a homicide to a lower degree than murder, and, "that the provocation must consist of personal violence, or . . . the danger of such must be apparent and imminent." This court approved the instruction on authority of State v. Starr, 38 Mo. 270, 277, and two other cases.

But the Brown case is out of line with the overwhelming weight of authority in this State. Of the three decisions it cites only State v. Starr is in point, and that case, instead of upholding, rules directly contrary to the doctrine of the Brown case. The Starr case is probably the leading decision on the question in Missouri. It lays down the law as follows:

"Where there is lawful provocation, the law, out of indulgence to human frailty, will reduce the killing from the crime of murder to manslaughter; but neither words of reproach, how grievous soever, nor indecent provoking actions or gestures, however much calculated to excite indignation or arouse the passions, are sufficient to free the party killing from the guilt of murder. To have the effect to reduce the guilt of killing to the lower grade, the provocation must consist of personal violence. . . . This rule is well established, and we imagine it would not be the part of wisdom to substitute in its place one fluctuating or less rigid, which would require the accused to be judged in each case according to the excitement incident to his natural temperament when aroused by real or fancied insult given by words alone. . . . There must be an assault upon the person, as where the provocation was by pulling the nose, purposely jostling the slayer aside in the highway, . . . or other direct and actual battery."

The above language from the Starr case has been quoted, in whole or in part, with approval in: State v. Gartrell, 171 Mo. 489, 517, 71 S. W. 1045, 1052; State v. Myers, 221 Mo. 598, 617, 121 S. W. 131, 137; State v. Sharp, 233 Mo. 269, 290, 135 S. W. 488, 493; State v. Barrett, 240 Mo. 161, 169, 144 S. W. 485, 486.

And the same rule has been applied in the denial or disapproval of instructions on manslaughter in: State v. McKenzie, 228 Mo. 385, 402, 128 S. W. 948, 953; State v. Bostwick, 245 Mo. 483, 486, 150 S. W. 1063, 1064; State v. Butler, 247 Mo. 685, 697, 153 S. W. 1042, 1045; State v. Shuster (Mo., Div. 2), 183 S. W. 296, 299; State v. Fletcher (Mo.), 190 S. W. 317, 322; State v. Borders (Mo.), 199 S. W. 180, 183; State v. Stewart, 278 Mo. 177, 186, 212 S. W. 853, 855; State v. Burns, 278 Mo. 441, 448, 213 S. W. 114, 117; State v. Allen (Mo.), 290 Mo. 258, 273, 234 S. W. 837, 841.

In the following cases manslaughter instructions were allowed, but in each instance there was evidence of an actual battery upon the defendant by the deceased, thereby conforming to the doctrine of the Starr case: State v. Gordon, 191 Mo. 114, 125, 89 S. W. 1025, 1028; State v. Darling, 199 Mo. 168, 197, 97 S. W. 592, 600; State v. Sebastian, 215 Mo. 58, 79 et seq., 114 S. W. 522, 528; State v. Conley, 255 Mo. 185, 198, 164 S. W. 193, 197; State v. Burrell, 298 Mo. 672, 680, 252 S. W. 709, 711; State v. Harp, 306 Mo. 428, 434, 267 S. W. 845, 846; State v. Rennison, 306 Mo. 473, 483, 267 S. W. 850, 852; State v. Carey, 313 Mo. 436, 446, 282 S. W. 22, 25. The Burrell case, just cited, was a banc decision reviewing many prior cases, and of those holding a manslaughter instruction unwarranted the opinion says: ''In the above cases the facts failed to justify an instruction on manslaughter, because there was no personal violence offered defendant such as is necessary to constitute reasonable provocation; that is, there were no provocative blows to engender passion.''

There are a few scattered decisions in which the law is not declared with the exactness found in the above quoted excerpt from the Starr case. Thus, in State v. Heath, 221 Mo. 565, 584, 121 S. W. 149, 154, it is said the general rule deducible from the cases is ''that where the provocation consists of an assault or personal violence,'' etc., a manslaughter instruction should be given. The same expression, in the disjunctive, is used also in State v. Bulling, 105 Mo. 204, 225, 15 S. W. 367, 372, 16 S. W. 830. In State v. Wilson, 242 Mo 481, 501, 147 S. W. 98, 104, the opinion declares ''An assault followed by an actual battery is *usually* deemed adequate provocation.'' In State v. Young, 314 Mo. 612, 634, 286 S. W. 29, 35, one of the reasons given why the defendant was not entitled to a manslaughter instruction was that the deceased was unarmed and made no *demonstration* of violence. And in State v. Richardson, 194 Mo. 326, 334, 344-5, 92 S. W. 649, 651, 655, where the deceased *struck at* the defendant and his wife with a razor and tried to cut the wife, it seems to be held these facts call for a manslaughter instruction though there was, apparently, no actual battery.

816

But in view of the long line of decisions cited in the preceding paragraphs it appears to be well settled that the law of this State is not as liberal as in some other jurisdictions; and that to constitute adequate provocation there must be more than opprobious words, more, even, than a demonstration with a deadly weapon imminently threatening danger—there must be actual violence to the person. In nearly all of the cases cited above where a manslaughter instruction was denied or disapproved, the deceased was so armed. (What we are saying has, of course, no reference to homicides committed on provocation in the defense of property or because of illicit sexual conduct of or with a near female relative.) Such is the general doctrine in Missouri; and, confining ourselves to the facts of this case, several of the foregoing decisions hold a threatening demonstration by the deceased with a knife is not enough, no personal violence being perpetrated. On this exact issue State v. Starr, State v. Sebastian and State v. McKenzie are in point. The facts in the McKenzie case are much like those here. In the Sebastian case an instruction was criticized as too broad and not conforming to the precedents, because it allowed the jury to convict the defendant of manslaughter if they found the deceased "in a threatening manner, and within striking distance, either *struck at* or struck defendant" with a corn-knife.

It may seem illogical to say the insulting but comparatively harmless jostling of a person on the highway, or a mere tweaking of the nose, may be sufficient to constitute lawful provocation, whereas a hostile demonstration with a deadly weapon threatening imminent danger to life will not, though accompanied by vile and insulting language. But the law cannot have a rule exactly accommodating itself to the varied dispositions of people and altogether putting a premium on turbulent tendencies. A killing even in heat of passion is not justifiable. For the proper administration of justice some absolute standard of conduct is required. Trial judges must not be left to grope in the dark; nor should the law be made to depend on the views of the individual judge. Though the provocation fall short of being adequate or lawful, within the foregoing rule, it will still often be what is denominated "just" and reduce the homicide to second degree murder. [State v. Bulling, supra, 105 Mo. 1. c. 221, 15 S. W. 1. c. 371.] Where the defendant believes and has reasonable ground for belief that an impending assault imminently threatens his life or great bodily harm, he can act in self-defense and be completely exculpated though there be no battery. Juries may be depended upon to deal with the particular facts as justice demands. It is hard to improve on the common law rule.

So much for the cases on adequate provocation as applied to homicides—fatal assaults. The few cases on malicious assault with intent

to kill not resulting in death, seem to follow the same rule though not specifically applying it. State v. Bartlett, 209 Mo. 403, 107 S. W. 1084, and State v. Harris, 209 Mo. 423, 108 S. W. 28, both opinions by GANTT, J., are illustrative of that fact. In the former the prosecuting witness and the defendant were quarrelling, but without personal violence, when the assault was committed, and it was held the defendant was not entitled to an instruction on a lower grade of assault. In the Harris case the defendant testified the prosecuting witness assaulted and struck him after cursing him, and it was ruled an instruction should have been given on assault without malice. In State v. Cruts, 288 Mo. 107, 117, 231 S. W. 602, 605, the defendant testified he was assailed by the complaining witness with a pitchfork, whereupon he shot him several times. The State's evidence showed the defendant's act was brutal and unprovoked. This court held th' case presented by the facts was simply one of malicious assault, on the one hand, or of self-defense on the other, and that there was no room for an instruction on a lesser grade of assault—and this in the face of the fact that the defendant claimed the prosecuting witness had committed a battery upon him. There is reason for saying this case goes too far, though it is referred to approvingly and followed in State v. Turnbo (Mo.), 267 S. W. 847, 849.

In the Turnbo case this court upheld the refusal of an instruction on assault without malice. The complaining witness had not inflicted personal violence on the defendant, but the decision is not expressly based on that ground. Similarly, in State v. Jones (Mo.), 217 S. W. 22, and State v. Johnson (Mo.), 326 Mo. 1030, 33 S. W. (2d) 912, it was held the facts did not show sufficient provocation to reduce the grade of the assault. In State v. Fine (Mo.), 324 Mo. 194, 23 S. W. (2d) 7, cited by appellant, this court held an instruction on assault without malice should have been given though there was no adequate provocation by a battery upon the defendant; but the defendant's version of the difficulty was that he merely pointed a loaded rifle at the complainant to protect his own property and did not fire it, thus indicating lack of malice. Without further discussion we rule that under the decisions and the facts of this case the defendant was not entitled to an instruction on assault without malice.

 III. It will be remembered officer Anderson testified for appellant that after the shooting he found the butcher knife which figured in the trial on the floor in the *basement;* and that he searched for it there because the appellant directed him to that place. After finding the knife the officer showed it to the appellant and preserved it as an exhibit but was not permitted to tell what further the appellant said to him. This harmonized with the appellant's testimony that the

complaining witness Squires had seized the knife in the kitchen and chased him downstairs to the basement, and that Squires had the knife in his hand when shot. On the other hand, it tended to contradict Squire's statement that he had not taken the knife from its usual place in the kitchen that morning, or had it at all. There was an interval of some five minutes or so between the shooting and the time when the officers first got to the house, during which appellant was there alone. Addressing himself to this phase of the evidence the assistant circuit attorney made certain closing argument to the jury, evidently replying to appellant's counsel, which appellant assigns as error. The argument, objections and rulings of the trial court were as follows:

"Mr. Sullivan: What about this knife, where did this knife come from, he asked you that question, this knife came from the basement where this defendant John Bongard put it either before or after he sent that .45 calibre bullet into the brain of James Squires.

"Mr. Schneider: There is no evidence here that that knife was put there by Bongard and I object to it.

"The Court: Arguing his own theory of the case, he can do that.

"Mr Sullivan: There is evidence that he told the police officer where they could find it.

"The Court: There is no evidence that he put it there, of course the jury knows that.

"Mr. Schneider: I object to counsel's remarks.

"The Court: Overrule the objection."

The decision cited by appellant, State v. Webb, 254 Mo. 414, 434, 162 S. W. 622, 628, is not comparable to this in its facts. The prosecutor was entitled to draw any inference from the evidence which he in good faith thought was warranted thereby. [State v. Murray, 316 Mo. 31, 38, 292 S. W. 434, 438.] The complaining witness denied he put the knife in the basement. Somebody did; the appellant had an opportunity to do it, and it was to his interest to have it found there. The inference was allowable, and the trial court fully protected the appellant's rights in stating there was no evidence that he had put the knife in the basement. This assignment is ruled against the appellant.

IV. The appellant's final assignment is that the punishment assessed by the jury was so excessive as conclusively to indicate passion and prejudice and call for a new trial, citing State v. Prendible, 165 Mo. 329, 353, 65 S. W. 559, 566. The punishment fixed by Section 4014, Revised Statutes 1929, is imprisonment in the penitentiary not less than two years, and therefore maybe for life. In this case the jury fixed the punishment at twenty-five years. The evidence for the

State showed a cold-blooded, prearranged assault with a deadly weapon. The appellant compelled Squires to sit down in a chair with his hands behind him and then deliberately shot him through the neck and head from a distance of less than ten feet. For him it was a fortuitous and we may say fortunate circumstance that Squires did not die. If he had, on the foregoing facts, the appellant could have been hanged. The punishment imposed is heavy but we do not think that under the statute and the facts this court is called upon to interfere with the jury's verdict. [State v. Curtner, 262 Mo. 214, 220, 170 S. W. 1141, 1143.] We find no error in the record and the judgment of the trial court is affirmed. All concur.