STATE of Missouri, Respondent,

v.

Jessie WRIGHT, Appellant.

No. 47232.

Supreme Court of Missouri,
Division No. 2.

July 11, 1960.

Robert A. McIlrath, Flat River, for appellant.

John M. Dalton, Atty. Gen., J. Burleigh Arnold, Asst. Atty. Gen., for respondent.

LEEDY, Presiding Judge.

Jessie Wright was charged in the Circuit Court of St. Francois County with murder in the first degree in having shot and killed Thomas J. Mann on February 4, 1958. Tried by a jury, she was found guilty of murder in the second degree, and her punishment fixed at ten years' imprisonment in the penitentiary; judgment and sentence accordingly, from which she has appealed.

The points raised on this appeal assign error in the refusal of two instructions, the allegedly repetitious propounding of prejudicial questions to defendant by the prosecutor, and in permitting cross-examination of defendant's husband on matters not covered by his direct examination. No challenge is made of the sufficiency of the evidence to support the verdict.

Defendant admittedly killed Mann about midday on the date in question by shooting him with her husband's .38 caliber Smith & Wesson revolver as he sat in the driver's seat of his Chevrolet car while parked on a little-traveled country road. Defendant had accompanied Mann to this place as his guest-passenger, and the shooting occurred within minutes after their arrival. She sought to justify the killing as having been committed in the necessary defense of her person in repelling an assault upon her by deceased with intent to rape or do great bodily harm. The court instructed on the law of self-defense, but defendant also asked an instruction on manslaughter which was refused. Whether the court should have instructed on the latter subject is the controlling question presented on this appeal.

The evidence was such as to have warranted the jury in finding these to be the facts: Defendant is a married woman, and lived with her husband and daughter near the town of Esther. Mann was also married, and lived with his wife some three or four miles distant from the Wright home. The ages of the principals do not affirmatively appear, but it is inferable that they were middle aged. Defendant had known the deceased for four or five years, and, except for the last six months of that period, had been engaging in sexual intercourse with him at intervals ranging from once a week to once a month. Defendant testified these relations had their inception at the point of a revolver held on her by Mann; that notwithstanding her desire and efforts to terminate such extramarital relations, they were continued because of threats to her person ("If I didn't do as he said, he

wouldn't hesitate to kill me"), and because he threatened to tell her husband, her daughter, and the community what had been going on. All the while he continued to force his attentions upon her. The latter included persistent pursuit on his part by personal contact, letters, telephone calls, etc., the details of which need not be repeated. Rumors reached her husband, who took steps looking toward a divorce. Defendant did not want a divorce, but in the negotiations in that connection defendant made full disclosure to her husband (as well as his attorney) of her improper conduct with Mann for approximately four years, explained its origin and her reason for its continued existence as hereinabove related, and promised she would not see Mann, or any longer continue the affair, she being no longer afraid of him. This was on or about January 10th preceding the killing. Her husband accepted her explanation and promise, and they left the attorney's office together, and within three or four days they proceeded to St. Louis, and to the offices of the Federal Bureau of Investigation and exhibited certain threatening letters defendant had received from Mann. The FBI referred them to the postal authorities, to whom the letters were delivered, but the latter took no action in the matter.

On the day in question defendant was at the farm of her mother-in-law, Mary Wright, in a remote section of St. Francois County. She had been called there to assist in taking care of her ill mother-in-law. In packing in preparation for the stay at Mary Wright's, defendant "slipped" her husband's .38 revolver into her effects, and took it with her "for protection," as she had done on a prior occasion. She had not had a date with, nor been in the company of Mann since the preceding August, or a period of practically six months, during which time she had successfully avoided him.

About 9 o'clock on the morning in question, Mann drove up to Mary Wright's gate and blew the horn of his car. Defendant went outside and talked to Mann, who told her to get in the car, that he wanted to talk to her. She told him no, she didn't want to talk to him, and didn't want to have any more to do with him, to which Mann replied that she should meet him up on the road and talk to him; that "I'd better talk to him or I'd be sorry." Whereupon she returned to the house and continued to do general homework for about an hour, and then went outside and saw Mann's car parked some distance away "up on the road on this side of the church"; that she went across the field to go up where he was "to talk to him * * * to tell him to leave me alone, that I told Tony everything—all about everything."

She further testified that when she came across the field he said she should get in the car, and talk to him; that she did get in, and he started the car and headed east; that she tried to get out, but he wouldn't stop; that he drove about four miles and parked on a road in an isolated area, the nearest house being a half mile away.

There were no other eyewitnesses so we are limited to defendant's account of the facts immediately surrounding the killing, as follows: (Whatever conversation had taken place between the parties enroute to, or while parked at the roadside, was not fully or satisfactorily developed. It does appear, however, that Mann "began to say something about was I mad at him, or something on that order," but the witness did not recall her reply.) They sat there for four or five minutes during the course of which time Mann unzipped his pants and asked her to have some wine (he usually kept a bottle under his seat), and either put, or attempted to put (the record is both ways) his arm around her. He told her he had been at that place before; that he had brought her there for a purpose, and he intended to get what he wanted while he was there. She then told him she didn't feel well, and that she wanted to get out of the car. She did get out and went around behind the car to his side; he lowered his window, and she asked him to let her alone, stating that she "didn't want to bother with him, and didn't want to see him any more."

He told her he would never let her alone and that she had better get back in the car. When she told him she was not going to do that, "he reached over to the glove compartment [where she knew he kept his gun, having seen it there at least ten or fifteen times] and I shot him." The gun was possibly 18 inches from his head when she fired. When he did not relax at the instant she shot him, but continued to reach for the glove compartment, she pulled the trigger again. She said she shot him when he reached toward the glove compartment because she thought he was going to kill her if she didn't have intercourse with him.

Mann's body was discovered the next morning in his parked car. It was in the driver's seat, "slumped slightly to the right * * * toward the pocket of the car"; his pants were unzipped; a pint bottle of wine, about half full, was found in the car at the scene, and when "brought in" a loaded .38 Colt revolver was found in the glove compartment wrapped in a rag. He had been shot twice on the left side of the head.

■ Turning to defendant's first point which complains of the failure to instruct on manslaughter, both sides cite the general rule that violence to the person is the standard exacted by the law as affording the basis for the inference of that heat of passion which reduces the grade of crime in a homicide case from murder to manslaughter. State v. Starr, 38 Mo. 270; State v. Bongard, 330 Mo. 805, 51 S.W.2d 84; State v. Creighton, 330 Mo. 1176, 52 S.W.2d 556; State v. Biswell, 352 Mo. 698, 179 S.W.2d 61; State v. Porter, 357 Mo. 405, 208 S.W.2d 240; State v. Taylor, Mo., 309 S.W.2d 621.

■ Without conceding that it would be necessary to decide the instant case on the basis of the narrow rule just stated, we think it may be done with propriety because, in our opinion, there was sufficient evidence of personal violence to bring the case within its terms, at least technically. As has been expressly pointed out, the rule has no "reference to homicides committed on provocation * * * because of illicit sexual conduct of or with a near female relative." State v. Bongard, supra (330 Mo. 816 and 51 S.W.2d 89). The writer is of the view that where the female is accused of homicide growing out of a deceased's attempt to have sexual relations with her against her will, the law should not put her in a less favorable position as regards provocation than that which would be occupied by her near male relative who had slain immediately upon discovery of the offending conduct. Why would it not generate heat of passion where a woman bent upon bringing about a cessation of her illicit sexual relations meets an equally determined counterforce on the part of her paramour or the former recipient of her favors, and the man nevertheless undertakes to violate her person?

The state argues that there was no evidence of personal violence or assault committed upon defendant by deceased, and therefore no provocation "because, at the time the shooting took place, the defendant was standing outside the automobile, on the driver's side, and the deceased was sitting inside the car. No assault or battery was or could have been committed by the deceased upon defendant under these circumstances." The defendant argues to the contrary. The state's position ignores what had immediately preceded defendant's alighting from the car. If, as in the classic examples so often referred to in the cases cited above, "a mere tweaking of the nose" or the "comparatively harmless jostling of a person on the highway" may be sufficient to constitute lawful provocation, then how much more grievous was Mann's amorous advance by way of actually putting his arm around defendant and unzipping his trousers! We are unwilling to say that these facts and deceased's declarations (both before and after defendant got out of the car), including his direction that defendant "better get back in the car," coupled with his simultaneously made gesture toward the glove compartment, were insufficient, as a matter of law, whereon the jury

might reasonably base an inference of heat of passion. The defendant was entitled to an instruction on manslaughter, and the failure to give it constituted reversible error.

▮ We fail to find prejudicial error in the refusal of defendant's instruction 1–D on the subject of self-defense, this for the reason that an instruction on that subject which the court did give adequately and fairly submitted the issue.

▮ The defendant's husband was permitted to be interrogated on cross-examination as to whether one of his neighbors had told him that his wife had given several gifts to Mann, and specifically a wrist watch. The objection interposed was: "This is out of line, immaterial, irrelevant and this is the husband of the defendant here. That isn't proper cross-examination under those circumstances." While the protection of the statute, Section 546.260, RSMo 1949, V.A.M.S., could have been more plainly and directly invoked, it is apparent that the trial court understood such to be the purport of the objection. And, contrary to the state's view, we rule the point was sufficiently preserved by the motion for new trial.

The single statement in the direct examination of this witness to which the offending cross-examination could possibly have reference is to be found in his answer (italicized below) to a question propounded in the course of ascertaining when the witness had determined that Mann was going out with his wife, as follows: "Q. Later did you come to my house rather than my office? A. Yes, *when the neighbors begin to talk.*" Thus it will be seen that he did not say he had talked with the neighbors, and hence did not repeat any part of a conversation. It is true that upon cross-examination of a defendant, or his or her spouse, "the state is not limited to a mere categorical review of the matters referred to in chief, but may make a detailed inquiry into matters which have been referred to only in a general way on direct examina-

tion." Section 546.260; State v. Kaufman, Mo., 254 S.W.2d 640, 641; State v. Burchett, Mo., 302 S.W.2d 9, 19. The quoted cryptic statement on direct was not sufficient to subject the witness to cross-examination in the particulars noted. In substance, his answer to the inquiries was that he did not recall, and in this situation we withhold determination of the question whether the error was prejudicial.

The other assignment has to do with the manner of propounding questions to defendant by repetitious allusions to her illicit relations with Mann. In view of the disposition we find it necessary to make of the appeal, the matters complained of under this assignment are not likely to recur on another trial, and hence need not be ruled.

For the error in failing to instruct on manslaughter, the judgment is reversed and the cause remanded.

All concur.