**STATE of Missouri, Respondent,**

v.

**Robert Lee TINSON, Appellant.**

**No. 55508.**

Supreme Court of Missouri,
Division No. 1.

Dec. 14, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied
Jan. 11, 1971.

John C. Danforth, Atty. Gen., J. Michael Jarrard, Asst. Atty. Gen., Jefferson City, for respondent.

Hubert I. Binowitz, Gary T. Sacks, Charles P. Bubany, St. Louis, for appellant.

HIGGINS, Commissioner.

Robert Lee Tinson, with a prior felony conviction of carrying a concealed weapon, was convicted by a jury of murder, first degree, of Willie C. Buchanan, and the court assessed his punishment at life imprisonment and rendered judgment and sentence accordingly. §§ 564.610, 556.280, 559.010, 559.030, V.A.M.S.

Appellant tacitly concedes that the state made a submissible case, but contends he should have a new trial because the court erred in failing to instruct the jury on manslaughter.

The circumstances surrounding the homicide, including the evidence most favorable to appellant's contention, are that on January 4, 1969, he was sitting on the passenger side of the front seat of his 1966 Chevrolet convertible automobile parked at Lawyer's Lounge, a tavern at Cockrill and Ella, St. Louis, Missouri. His friend, Kenneth McBee, was seated on the driver's side of the automobile. The tavern is a two-story building with living quarters on the second floor and the barroom on the first floor. Also on the first floor and to the north of the barroom, separated by a hall and partition, is a storeroom of 14 x 28 feet. The storeroom is entered through a door in the partition. A men's room is located adjacent to the south wall of the storeroom and its door is in its west wall close by the door between the two main rooms.

At about 2:40 p.m., defendant and his friend were preparing to enter the tavern when Willie Buchanan, known to defendant for about two and a half years, "snatched open" the right-hand door of the automobile. Willie was a large man, five feet ten inches in height and two hundred fifty pounds in weight. He demanded that "Little Robert," defendant, take him to Richmond Heights. Upon defendant's refusal, Willie's demand was renewed and punctuated with such emphasis as "Son of a bitch, you can take me to Richmond Heights." Willie was at this time leaning on top of the automobile looking down at defendant who again refused the demand, after which Willie pulled his pistol and pointed it at defendant. Defendant repeated his refusal and told Willie to close the car door, whereupon Willie fired the gun into the ground in the space between the open door and the car. Two or three companions of Willie's then persuaded him to leave the area.

Defendant and his friend then entered the tavern and defendant went upstairs in search of Lawyer John Milloy, the proprietor. Defendant aroused Milloy and asked him for protection. Milloy would not give his gun to defendant but assured defendant he would keep Willie Buchanan out of the tavern. After some five or six minutes and with this assurance, defendant went into the storeroom where six to eight persons were

standing around a table shooting craps. "And we was back there about fifteen, twenty minutes and maybe a little less, when Buchanan came in * * * it was about four guys on each side of the table and it was two at the end where I were. and the other end wasn't anyone there. * * * so we heard the door say 'Boom' and it came open. In come Buchanan and two of his friends * * *. And when he came in he just walked up to the table and laid over the table * * * and when he come out of his pocket to lay over the table he had the gun in his hand. So immediately when I seen the gun I backed away from the far end of the table, * * * and he looked at the guy on this end * * * and said, 'Anybody seen Little Robert?' No one said anything. He said, 'That damn Lawyer didn't want me to come in, talking about I shot at Little Robert on the outside, and Little Robert told him and he didn't want me to come in the damn place.' * * * Then he said, 'When I see him I'm going to put this on him.' So then the dude said, 'Put that gun up, man, and let's gamble.' So immediately I looked around like this (indicating), and the beer cases was lined off so there was a shotgun, it was a new shotgun lying there, so I grabbed it, and as I walked out I goes around the crowd and gets to the door and gets out the door and into the bathroom. While I'm in there checking it, I didn't have any shells or nothing, I said, 'If the dude starts anything I'm going to have to try to keep him off me.' And I tried to reverse the gun, and while we trying to reverse it, it goes off. * * * So, I said, 'I can't let them hear me up in here,' and I steps outside the door, and when I steps outside the door I looked and just as I looked he was standing in the door. The door was already open. So he said, 'Nigger, what are you doing shooting that gun in here?' I said, 'The gun went off, man.' So I turned slightly to go into the tavern, down to the tavern, when he said, 'Nigger,

you're telling a god damn lie.' So I turned back around. I knew the expression from the sound of his voice that he had this on his mind, so I turned, as he said it he was coming from his hip pocket again, and I still didn't know was it any more bullets left in the gun, but I cocked it again and up, as he came up I fired. So it still, he didn't move, and he steady come up and when he come up further I shot again, at that time it hit him and drove him back * * *." Willie later died from wounds received from the shotgun blast.

Defendant asked Lawyer Milloy to call the police but Milloy wished him to leave because some of Willie's family were on the way. After a "tussle" over the gun with Willie's brother, Jessie, defendant left and was arrested in his automobile without resistance at 3:55 p.m. He admitted the shooting and stated he had "nothing to hide. The man was trying to kill me."

In the previous December, Willie had pulled a gun on defendant and said, "Nigger, I ought to kill you," when defendant objected to Willie's stealing a "Christmas kitty" at another bar. Defendant had also seen Willie shoot and rob a man.

The police found no weapon on deceased but did find five live .32-caliber cartridges in his pocket.

Section 559.070 provides that "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." The standard as to the evidence required to authorize or require the giving of an instruction on manslaughter when one is charged with murder is "whether there is evidence to warrant a finding by a jury that defendant was guilty of manslaughter as that offense is defined by § 559.070, supra. * * * (and) there must be *proof* of facts tending to show want of premeditation and malice to warrant an instruction on manslaughter."[1]

1. The grade of homicide is reduced to manslaughter by provocation which consists of conduct, usually personal violence, producing an effect thereof on the mind of the defendant. State v. Hunter, Mo., 444 S.W.2d 392, 394.

State v. Williams, Mo., 442 S.W.2d 61, 64[2–5].

■ The evidence permits inferences of premeditation and malice necessary to a conviction for murder, as well as to support a finding of excusable or justifiable homicide in self-defense. These circumstances, however, do not preclude the inference of an absence of premeditation and malice and the finding of provocation sufficient to warrant an instruction on manslaughter. The jury could properly have found that defendant was suddenly and unexpectedly confronted by the deceased in the back room of the tavern; that the confrontation was accompanied with gun in hand and threats to use it on defendant; that such actions took place within a few minutes of a prior assault in which the deceased had made demands of defendant and discharged his gun in punctuation of them; that defendant felt himself cornered by one whom he knew to be of violent nature; that in his anxiety he seized a shotgun that was present; that when deceased offered further personal violence by further advances and gestures toward his pocket and, while subject to the panic thus surrounding him and so provoked, defendant discharged the shotgun. Such circumstances are similar in effect to those warranting a manslaughter instruction in State v. Williams, supra, where defendant entered the house of Esque Williams by invitation or consent; Joe Matthews was present and Mrs. Matthews said, apparently to Matthews, "that is him, partner, get him"; Matthews then drew his pistol and fired at defendant but missed; defendant then drew a pistol and shot and killed Matthews.

Respondent cites State v. Bongard, 330 Mo. 805, 51 S.W.2d 84, and cases following it, to argue that defendant was not entitled to an instruction on manslaughter because there was no battery and therefore no "personal violence" committed against defendant by the deceased. Suffice to say that the obvious effect of State v. Williams, supra, in which there was no battery, was the overruling of that line of authority. See also State v. Hunter, supra, 444 S.W.2d l.c. 394–395[3, 4], and concurring opinion of Finch, J., 444 S.W.2d l.c. 396; and see also State v. Hawkins, Mo., 418 S.W.2d 921, 924[4], that flourishing and pointing a gun, climbing over the counter, ordering an assistant cashier back and threatening to blow her head off, constituted substantial and submissible evidence of "violence to the person."

Respondent also cites a number of cases on "cooling off period" and argues that such is shown by the time which elapsed between the encounter outside the tavern and the fatal shooting. It is not necessary to discuss and distinguish those authorities and that time lapse because there was no appreciable time lapse between the confrontation at the crap table which precipitated the shooting and the fatal shooting itself moments later.

Appellant complains also that the court failed to instruct "on threats when a self-defense instruction was given." No such instruction was requested and no such point was presented in the motion for new trial. Consequently, the matter is not for review, State v. Cook, Mo., 428 S.W.2d 728, 734[6], and questions concerning such an instruction can be settled upon retrial by reference to that authority.

■ Another question which may arise upon retrial is the admissibility of evidence with respect to deceased's reputation for turbulence and violence. All concerned upon retrial should be advised of State v. Hicks, Mo., 438 S.W.2d 215, 219[6], that "the general rule recognized in Missouri is that the reputation or character of the person killed for turbulence or violence cannot be established by proof of specific acts of violence on his part against persons other than the defendant."

For error in failing to instruct on manslaughter the judgment is reversed and the cause is remanded.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

SEILER, P. J., and BARDGETT, J., concur.

HOLMAN, J., dubitante.